**UNITED STATES OF AMERICA,**
Plaintiff,

v.

**John W. SELJAN, Defendant.**

**No. SA CR 03–232 AHS.**

United States District Court,
C.D. California, Southern Division.

July 30, 2004.

Richard Lee, United States Attorney, Santa Anna, CA, for Plaintiff.

Allan H. Stokke, James D. Riddet, Stokke & Riddet, Santa Ana, CA, for Defendant.

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

STOTLER, District Judge.

### I.

### *INTRODUCTION*

International border search jurisprudence pertains to the lawfulness of searches conducted at, near, and distant from real borders. Defendant's motion draws into issue "exit" searches of items leaving the United States via aircraft, namely, whether Customs' searches of defendant's international Federal Express ("FedEx") document-sized packages which he sent from California to the Phillippines violated Fourth Amendment principles. Under the border search exception to the Fourth Amendment, such a search does not require any warrant, probable cause, or reasonable suspicion. The Court concludes that each of the three searches took place at the functional equivalent of the international border.

Although each package was intercepted during currency interdiction operations by United States Bureau of Immigration and Customs Enforcement ("BICE" or "Customs") agents operating at the FedEx sorting facility based at the Oakland International Airport, these packages did not yield evidence of prohibited monetary transactions. Instead, inspectors found evidence of pedophilia-related offenses.

The evidence adduced at two suppression hearings identified the precise trans-Pacific route established by FedEx for these packages. While the packages did not depart the U.S. mainland from any real border nor directly from Oakland, under the applicable law, all three searches may be said to have taken place at the border or its functional equivalent. The evidence further shows that the defendant, in signing the air waybill, gave advance consent to the search of his packages prior to shipping them. Later searches of defendant's luggage as he attempted to depart for the Phillippines and of his residence, along with defendant's arrest and interview statements, led to and constitute admissible evidence for trial. These conclusions lead to denial of defendant's motion.

### II.

### *FINDINGS OF FACT*

The Court makes the following Findings of Fact in support of its denial of defendant's motion.

1. On Wednesday, November 20, 2002, John W. Seljan ("defendant" or "Seljan") sent an international FedEx package to the Phillippines. This package was detained by United States Customs agents and did not depart the country until November 22, 2002.

2. On Saturday, August 2, 2003, defendant sent an international FedEx package to the Phillippines.

3. On Friday, September 26, 2003, defendant sent an international FedEx package to the Phillippines.

4. Defendant personally sent each of the three FedEx packages.

5. Affixed to each of these packages was an international air waybill that defendant filled out and signed. In signing the waybill defendant agreed to the terms and conditions located on the back of the waybill.

6. One of the air waybill's terms provides: "Right to Inspect. Your shipment may, at our option or at the request of governmental authorities, be opened and inspected by us or such authorities at any time."

7. Defendant knowingly and voluntarily sent each of the three FedEx packages to the Phillippines. Defendant testified that he understood that his packages would be expected to "clear customs" before departing the United States.

8. International FedEx packages sent from Southern California are routed through the company's hub at Oakland International Airport for sorting. Overnight document-sized packages are sorted into bags by country of destination. Upon completion of a "sort" for a particular country, such as the Phillippines, FedEx places all of the document-sized packages into a single container. Prior to departure from Oakland, each container is locked, weighed and given one consolidation number per container. An individual package in the container may be tracked based on its association with the consolidation number.

9. If a package is inspected by the U.S. Customs Service, its agents do so prior to the placement of the packages into the container. Once loaded into a container, a package is not removed until it arrives in the Phillippines.

10. Due to weight restrictions at the Oakland airport, some outbound containers are placed on a truck and transported to a smaller FedEx "ramp facility" at San Francisco International Airport. Other containers are loaded onto an airplane which departs from Oakland and lands immediately in San Francisco. The trucked-in containers are directly loaded onto the same aircraft. U.S. Customs agents do not conduct further investigations of the packages or containers in San Francisco.

11. Following a set of procedures dubbed "system form" by FedEx, packages bound for the Phillippines depart on flights at approximately 4:00 a.m., Pacific time. The sorting of these packages begins the night before at the Oakland hub. On Tuesday, Wednesday and Thursday mornings, the flight departs San Francisco and proceeds directly to the FedEx facility at Narita International Airport in Japan. On Friday, Saturday and Sunday mornings, due to increased freight, the flight stops in Anchorage, Alaska, for refueling before proceeding to Narita. There is no Monday morning flight.

12. The stop-over in Anchorage is characterized by FedEx as a "gas-and-go" because the flight lands solely to take on additional fuel. No packages or containers deplane in Anchorage. The U.S. Customs Service does not conduct inspections of FedEx flights which stop in Anchorage for refueling.

13. On November 21, 2002, Customs inspectors were conducting an outbound currency interdiction operation targeting packages bound for the Phillippines. Customs inspectors were searching packages to determine if the sender was exporting currency in violation of 31 U.S.C. § 5316.

14. On November 21, 2002, Customs Inspector Tom LeBlanc searched an international FedEx package sent by defendant. The package contained a letter, 500 pesos and $100 in currency and return address labels with defendant's name and address.

15. In its opening paragraph, the letter states, "Yes, Honey [sic] I like little girls like you, but you did not send me a picture

of yourself." The letter also discusses defendant's possible travel to the Phillippines in the coming months, "I do want to see you, so please send me a picture of yourself [sic] ... For only 8 yrs [sic] old, you do have very nice handwritting [sic]. I know at your age that your 'PEANUT' [sic] smells like 'SWEET' Roses [sic]."

16. The contents of the package were photocopied by Customs inspectors before it was returned to FedEx custody for shipment.

17. The package, before it was stopped for inspection, was outbound on the Thursday, November 21, 2002, FedEx flight. Packages departing on this flight from the Oakland sort facility were transported by truck to San Francisco International Airport and loaded onto a plane which departed immediately for Narita, Japan.

18. Due to the detention of the package by the Customs Service, it did not actually depart the United States until Friday, November 22, 2002. This flight departed San Francisco in the early morning hours but stopped in Anchorage to refuel before proceeding to Narita.

19. On Sunday, August 3, 2003, Customs inspectors were conducting an outbound currency operation called "Midnight Money" at the Oakland FedEx hub. The purpose of the operation was to interdict the illegal export of funds from the United States to the Phillippines pursuant to § 5316.

20. On that date, Customs inspectors detained and searched a FedEx package sent by defendant on the preceding day. The package was brought to the attention of Agent LeBlanc who recognized defendant's name from the November 21, 2002 package.

21. The August 3, 2003 package contained two letters and several pages of adult pornography. The first letter was addressed to the recipient of the November-

ber 21, 2002 FedEx package. The letter describes defendant's desire to engage in sex acts with the minor-recipient. The second letter, apparently addressed to the recipient's mother, states, "I'll be coming back sometime in September. I let you know [sic] the date later ... I know [redacted] b-Day is September 21th [sic] she'll be XXXX 9."

22. The contents of the August 3, 2003 package were photocopied, repackaged, and sent on to the Filipino address marked on the air waybill.

23. Subsequent to August 3, 2003, BICE Special Agent ("SA") Andrew Vincik commenced an investigation of defendant. SA Vincik interviewed the property manager of defendant's former residence, as well as one of defendant's former neighbors. Both stated that defendant spoke of traveling to the Phillippines to "have sex with kids," that he showed residents child pornography and that he had bragged about his video and scrapbook collection of similar materials.

24. SA Vincik's investigation revealed that defendant had traveled to the Phillippines 43 times since 1992.

25. On September 24, 2003, defendant purchased a ticket on Phillippines Air scheduled to depart from Los Angeles International Airport ("LAX") for Manila, Phillippines, on October 3, 2003.

26. On Saturday, September 27, 2003, Customs inspectors at the Oakland FedEx hub, conducting further "Operation Midnight Money" currency interdiction efforts, detained and searched a FedEx package sent the preceding day by defendant from California to the Phillippines. The package was referred to Agent LeBlanc who opened and inspected its contents.

27. The package contained nine photocopied letters, $100 in U.S. currency, non-pornographic photographs of defendant

with minors and adult pornographic materials. One of the addressees was the same as the addressee of the November 21, 2002 and August 3, 2003 FedEx packages. The letters discussed defendant's desire to engage in various sex acts with the minor-recipients as well as defendant's impending travel to the Phillippines.

28. The package's contents were copied by Customs inspectors but it was not returned to FedEx for shipment to the Phillippines.

29. On October 3, 2003, the magistrate judge issued an arrest warrant for defendant and a search warrant for defendant's residence. SA Vincik submitted an affidavit in support of the applications.

30. On the evening of October 3, defendant arrived at LAX and checked baggage on Phillippines Air Flight 103 bound for Manila. Customs inspectors searched this luggage outside of defendant's presence.

31. Prior to defendant's boarding of Flight 103, Customs agents stopped defendant and conducted a search of his carry-on luggage. Agents discovered adult pornographic magazines, a child pornographic book, photocopies of letters written by defendant and approximately 52 photographs of defendant engaged in sex acts with Filipino minors.

32. After signing a *Miranda* waiver, defendant made several inculpatory statements regarding his planned trip to the Phillippines.

33. On the same evening, federal agents executed a search warrant on defendant's residence. The agents seized adult pornography, a fiction book about pedophilia and incest, a typewriter and various business and travel documents.

## III.

### *DISCUSSION*

Defendant's motion seeks the suppression of: (1) the contents (or copies thereof) of the three FedEx packages searched on November 21, 2002, August 3, 2003, and September 27, 2003; (2) the observations of Customs agents on September 2, 2003, regarding defendant's mail found at the Costa Mesa Post Office; (3) the items seized at defendant's home pursuant to a search warrant on October 3, 2003; (4) the luggage and its contents seized at LAX on October 3, 2003; (5) defendant's carry-on luggage and its contents; and (6) all statements allegedly made by defendant to government agents at LAX on October 3, 2003.[1]

### A. Searches at the Functional Equivalent of the Border

Defendant contends that the searches of the three FedEx packages were "extended border searches" conducted without reasonable suspicion and that all subsequent evidence is fruit of these impermissible searches and must be suppressed from the government's case-in-chief. *United States v. Cardona*, 769 F.2d 625, 627 (9th Cir. 1985); *see United States v. Davis*, 332 F.3d 1163, 1170 (9th Cir.2003); *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963). Defendant concedes that if the searches of the FedEx packages were proper, no "fruit of the poisonous tree" issue remains.

---

1. On February 2, 2004, defendant filed this motion to suppress. On February 25, 2004, the government filed opposition thereto. On April 29, 2004, defendant filed a reply brief. On May 5, 2004, the government filed a supplemental brief. On May 10, 2004, the Court held an evidentiary hearing on defendant's motion to suppress. On May 17, 2004, the parties filed additional briefing regarding the issues raised at the evidentiary hearing. On May 19, 2004, the Court took additional evidence on defendant's motion.

■ Under the border search exception to the Fourth Amendment, "a search may be initiated without a warrant, probable cause, or even reasonable suspicion." *Cardona*, 769 F.2d at 628; *United States v. Sutter*, 340 F.3d 1022, 1025 (9th Cir.2003). While initially governing only the search of persons or objects entering the United States, the border search exception now applies to persons or objects leaving the country ("exit searches"). *United States v. Duncan*, 693 F.2d 971, 977 (9th Cir. 1982) *cert. denied*, 461 U.S. 961, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983); *United States v. Des Jardins*, 747 F.2d 499, 503 (9th Cir.1984). The United States Supreme Court has long held that a border search, for Fourth Amendment purposes, need not take place at the actual physical border, but may also occur at its "functional equivalent." *Almeida–Sanchez v. United States*, 413 U.S. 266, 273, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973); *Duncan*, 693 F.2d at 977.

■ The reported decisions analyze the spatial and temporal distance from the actual border to distinguish between a search at the border's "functional equivalent" and an "extended border search," which requires reasonable suspicion.[2] *Cardona*, 769 F.2d at 628; *cf. United States v. Gaviria*, 805 F.2d 1108, 1112 (2d Cir.1986) *cert. denied*, 481 U.S. 1031, 107 S.Ct. 1960, 95 L.Ed.2d 531 (1987) (upholding a warrantless border search where the

goods entered the country in Miami but were not searched by agents until their arrival in New York). There must be a nexus between the goods searched and their impending departure from the United States to uphold a suspicionless search conducted at the equivalent of the international border. *Cardona*, 769 F.2d at 628; *United States v. Sierra–Garcia*, 760 F.Supp. 252, 267 (E.D.N.Y.1991) *quoting United States v. Ajlouny*, 629 F.2d 830, 834 (2d Cir.1980). To qualify as a search at the functional equivalent of the border "it is enough that the passenger manifest a definite commitment to leave the United States and that the search occur in reasonable temporal and spatial proximity to departure." *Duncan*, 693 F.2d at 977.

■ Here, the search of all three FedEx packages took place at the functional equivalent of the border. Scott Speaker, the International Regulatory Manager for FedEx at the Oakland facility, testified that packages bound for the Phillippines are sorted and placed into a locked container. This container is then transported by truck or aircraft to the company's ramp facility at the San Francisco International Airport. Upon arrival in San Francisco, the trucked-in containers join the containers flown over from Oakland on the same aircraft. After receiving those containers, the flight immediately departs from San

---

**2.** The Court's considerable independent research has not uncovered a published opinion which is squarely on point. The Ninth Circuit, however, in an unpublished opinion from the Western District of Washington, filed in 2001, discussed a search and seizure at the Memphis International Airport FedEx hub, one of the international shipping facilities discussed in testimony in this matter. The Court found that the search of an international FedEx package "three to four hours" prior to departure took place at the border's functional equivalent. In another unpublished decision, appealed from a Central District of California ruling and filed in 1995, the Ninth Circuit recognized that a stopover in New York prior to an international departure, where Customs agents did not have an opportunity to conduct further inspections, dictated that the "gate at LAX was the last opportunity for customs inspections before [defendant] would leave the United States; therefore, the Los Angeles to New York flight was the functional equivalent of an international departure...." Both of these cases, concerning failure to report monetary transactions, cannot be cited. Ninth Circuit Rule 36–3.

Francisco for Narita, Japan, either directly or via Anchorage, Alaska.

The first package at issue was searched on November 21, 2002, and was scheduled to depart on an early Thursday morning flight bound directly for Narita, Japan. This search occurred a few hours before the package's intended departure from the United States. Thus, a clear nexus exists between the search by Customs agents and the package's scheduled departure, supporting a finding that the search at the Oakland hub is tantamount to an inspection at the international border. *Sierra–Garcia,* 760 F.Supp. at 267; *cf. Cardona,* 769 F.2d at 628. The fact that the containers were placed on a truck and transported roughly 20 miles across the Bay Bridge to San Francisco does not alter this result. The doctrine of functional equivalence does not require that the search take place just moments before the plane departs San Francisco. *Duncan,* 693 F.2d at 977–78. Here, defendant clearly intended to send the parcel overseas and the search at the larger Oakland hub is sufficiently connected in space and time to the international departure from San Francisco to constitute a search at the functional equivalent of the border.

The analysis is the same with respect to the second and third FedEx packages sent by defendant on August 2, 2003, and September 26, 2003, respectively. FedEx employee Speaker established that, based upon the day of departure, those packages would have been consolidated into a single container before transport by truck to San Francisco. However, due to additional freight, instead of proceeding directly to Japan, the flights would have stopped for refueling in Anchorage, Alaska. Speaker's testimony established that the containers aboard such flights are not unloaded, opened, or inspected by Customs agents upon arrival in Anchorage. Thus, the last place for a "routine" customs search of the packages was the Oakland sorting facility.

Where, as here, a package is searched prior to placement on a flight with an international destination, "a border crossing is virtually certain even if intermediate stops in this country will be made first." *United States v. Bareno–Burgos,* 739 F.Supp. 772, 778 (E.D.N.Y.1990). Alaska's advantageous location as a stopover for trans-Pacific flights relegates Anchorage to the functional equivalent of a gas station, and the stopover does not, without more, convert the earlier inspections in Oakland into "extended border" searches. There are no established procedures for additional Customs inspections or for the transfer of the containers to a separate aircraft upon arrival in Anchorage. Nor does the aircraft remain on the ground for an extended period of time. The requirements of FedEx's "system form" demand that the aircraft travel as quickly as possible between San Francisco, Anchorage and Narita. Thus, despite the refueling stop on U.S. soil, the departure of the two packages at issue here was sufficiently imminent to support a suspicionless and warrantless search.

These facts distinguish this case from *Cardona,* relied on by defendant. *Cardona,* 769 F.2d at 628–29. In *Cardona,* the search occurred immediately after the package was picked up from the defendant and loaded on a FedEx truck. *Id.* at 628. The *Cardona* court concluded that because the search occurred twenty-four hours before the scheduled border crossing and 3,000 miles from a border, the search did not take place at the functional equivalent of the border. *Id.* Here, the packages' departures were imminent when compared to that in *Cardona* because both were searched immediately prior to being loaded onto the aircraft scheduled to transport them out of the country. These packages

were in the process of being routed to Japan even though the vessel in which they traveled required a refueling stop. The evidence shows that Customs agents in Anchorage, during the normal course of operations, do not search the cargo of refueling aircraft. Nor is there any indication that a search occurred in this case. The searches at issue here took place as part of a routine Customs operation, whereas the agents in *Cardona* specially stopped and boarded the FedEx truck immediately after it picked up two packages from the defendant's residence. *Cardona*, 769 F.2d at 627.

Even assuming that, due to the refueling stop in Anchorage, the August 3, 2003 and September 27, 2003 searches are classified as "extended border searches," the agents had reasonable cause to legally search the packages without a warrant. *Id.* With respect to the August 3 package, the evidence uncovered from the November 21, 2002 search provided the requisite reasonable suspicion. Reasonable suspicion is "a considerably milder standard than probable cause." *United States v. Dubrofsky*, 581 F.2d 208, 211 (9th Cir.1978); *United States v. Lopez–Soto*, 205 F.3d 1101, 1105 (9th Cir.2000). In the November 21 package, agents found a letter in which defendant wrote, "Yes, Honey [sic] I like little girls like you, but you did not send me a picture of yourself." Defendant also professed an intent to travel to the Phillippines in the near future. "I do want to see you, so please send me a picture of your-

self [sic] . . . For only 8 yrs [sic] old, you do have very nice handwritting [sic]. I know at your age that your 'PEANUT' [sic] smells like 'SWEET' Roses [sic]." Based upon these statements, agents had reasonable cause to suspect that the August 3, 2003 package, which was also addressed to the Phillippines, contained evidence of a violation of 18 U.S.C. § 2422(b) (use of interstate facility to entice a minor).

▇ Customs inspectors had reasonable cause to suspect that the September 27, 2003 package contained communications in violation of § 2422(b) based upon the investigation of SA Vincik in addition to the evidence discovered in the November 21, 2002 package. SA Vincik interviewed defendant's former neighbors and learned that he spoke openly of his trips to the Phillippines, where he had sex with minors. These individuals reported that defendant possessed images of child pornography. On September 24, 2003, SA Vincik learned that defendant had purchased a ticket on an Air Phillippines flight bound for Manila. This evidence provided the requisite suspicion for the search of the September 27, 2003 package.[3]

▇ Defendant argues that the three searches are invalid because the agents involved were operating under the mistaken belief that their activities were authorized by 19 U.S.C. § 1583 (authorizing warrantless searches by Customs agents of

---

**3.** If the searches of the first two packages were held to be invalid, the third package and the information uncovered by SA Vincik are nonetheless admissible under to the "independent source" doctrine. The "mere fact that Fourth Amendment illegality directs attention to a particular suspect does not require exclusion of evidence subsequently unearthed from independent sources." *Hoonsilapa v. INS*, 575 F.2d 735, 738 (9th Cir.1978) *modified* 586 F.2d 755; *United States v. Cella*, 568 F.2d 1266, 1285 (9th Cir.1977); *United States v.*

*Friedland*, 441 F.2d 855 (2nd Cir.1971); *United States v. Watson*, 950 F.2d 505 (8th Cir. 1991); WAYNE R. LAFAVE, SEARCH AND SEIZURE § 11.4(a) (3d ed.1996). The information from defendant's former neighbors, the postal employee, and defendant's ticket purchase were all acquired from sources not discussed in the letters uncovered in the November 2002 and August 2003 searches. This information would have provided reasonable cause to suspect that the contents of the September 27, 2003 package were contraband.

outbound international mail shipped by the United States Postal Service). However, the subjective beliefs of government agents in such circumstances are irrelevant for purposes of evaluating the validity of a search under the Fourth Amendment. *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996); *Lopez–Soto,* 205 F.3d at 1105. The agents had the objective authority to conduct a search pursuant to the border search exception which has been codified at 19 U.S.C. §§ 1581 and 1582; *Sutter,* 340 F.3d at 1025–26.

In addition, because the Customs inspectors were acting to interdict the export of money in violation of 31 U.S.C. § 5316, they had the authority to search defendant's packages pursuant to 31 U.S.C. § 5317(b). *United States v. Nates,* 831 F.2d 860, 862 (9th Cir.1987); *see, e.g., United States v. Whiting,* 781 F.2d 692, 696 (9th Cir.1986) (discussing the Customs Service's general authority to conduct warrantless border searches); *United States v. Soto–Soto,* 598 F.2d 545, 549 (9th Cir. 1979). Section 5317(b) provides that, "for purposes of ensuring compliance with the requirements of section 5316 a[C]ustoms officer may stop and search, at the border and without a search warrant ... any envelope or other container ... departing from the United States." Thus, while the agents' conduct is evaluated by the objective test of the Fourth Amendment, the Customs inspectors had clear statutory authority to conduct all three searches. *See Duncan,* 693 F.2d at 976 n. 7.

**B.  Consent to the Searches**

█  The evidence supports the conclusion that defendant gave advance consent to the searches of the three FedEx packages. "A warrantless search is valid if conducted pursuant to the knowing and voluntary consent of the person subject to the search." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36

L.Ed.2d 854 (1973). Both the Eighth and Fifth Circuits have held that a defendant may validly consent to a search via his agreement to the terms of a contract. *United States v. Brown,* 763 F.2d 984, 987– 88 (8th Cir.1985); *United States v. Griffin,* 555 F.2d 1323, 1325 (5th Cir.1977). Defendant testified that he signed the three international air waybills affixed to the respective packages. Each of the air waybills provides that the sender agrees to allow the shipment to be opened and inspected by FedEx employees or governmental authorities. Defendant also testified that he was aware that the packages would have to "clear customs" before departing the United States and that he had voluntarily mailed the packages. Based upon defendant's signature on the air waybill, Customs agents were not required to obtain a warrant to search the packages.

**C.  Reasonableness of the Searches**

The searches of defendant's three FedEx packages, under the circumstances already discussed, were reasonable. "The Fourth Amendment requires that a valid exit border search be conducted in a 'reasonable' manner." *Cardona,* 769 F.2d at 629. "The scope of the intrusion, the manner of its conduct, and the justification for its initiation must all be considered in determining whether a search comports with reasonableness." *Duncan,* 693 F.2d at 977. The three searches at issue in this motion were reasonable in their scope and conduct. In carrying out these "border" searches, BICE agents reasonably examined the packages' contents to determine if they were seizable. *Cardona,* 769 F.2d at 629–30. Photocopying the packages' contents was permissible because it was done in furtherance of a proper governmental purpose, preserving evidence. *See United States v. Fortna,* 796 F.2d 724, 738–39 (5th Cir.1986).

## IV.

### *CONCLUSION*

Accordingly, and for the foregoing reasons, defendant's motion to suppress evidence is denied. This Opinion and Order supersedes the Court's original Order Denying Defendant's Motion to Suppress filed on May 28, 2004.

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Order on counsel for all parties in this action.