**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

    v.

JOHN W. SELJAN,
        *Defendant-Appellant.*

No. 05-50236

D.C. No.
CR-03-00232-AHS

OPINION

Appeal from the United States District Court
for the Central District of California
Alicemarie H. Stotler, District Judge, Presiding

Submitted October 18, 2006*
Pasadena, California

Filed August 14, 2007

Before: Harry Pregerson, Ronald M. Gould, and
Richard R. Clifton, Circuit Judges.

Per Curiam Opinion;
Partial Concurrence and Partial Dissent by Judge Pregerson

---

*This panel unanimously finds this case suitable for decision without
oral argument. *See* Fed. R. App. P. 34(a)(2).

9837

**COUNSEL**

Jerald Brainin, Los Angeles, California, for defendant-appellant John W. Seljan.

Richard Y. Lee, Assistant United States Attorney, Santa Ana, California, for plaintiff-appellee United States.

## OPINION

PER CURIAM:

Defendant-Appellant John Seljan appeals his conviction and sentence for multiple counts of attempting to travel in interstate commerce to engage in illicit sexual conduct, using interstate facilities to entice a minor into engaging in criminal sexual activity, and possessing and producing child pornography. Federal agents arrested Seljan after customs inspectors, conducting routine searches at a regional hub for FedEx, discovered sexually suggestive letters in internationally bound packages sent by Seljan. Seljan appeals the district court's denial of his motion to suppress all evidence resulting from those searches.

We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.   FACTS AND PROCEDURAL HISTORY

FedEx routes international packages sent from Southern California through the company's regional hub in Oakland, California. The Oakland facility is one of four FedEx regional sorting facilities in the United States. At the facility, FedEx sorts packages by destination and places all document-sized packages bound for a particular country into locked containers. *United States v. Seljan*, 328 F. Supp. 2d 1077, 1079 (C.D. Cal. 2004) (order denying motion to suppress). Next, FedEx loads some containers bound for the Philippines directly on a plane that departs from Oakland International Airport and then lands across the bay at San Francisco International Airport. *Id.* Due to weight restrictions, FedEx transports other Philippines-bound containers by land to San Francisco International Airport. *Id.* Employees then load those containers onto the same plane that arrived from Oakland. *Id.* The plane then departs for Narita International Airport in Japan, with a possible refueling stop in Anchorage, Alaska. *Id.*

Seljan sent at least three FedEx packages to the Philippines between November 20, 2002, and September 26, 2003. *Id.* at 1078. Affixed to each package was an international air way-bill completed and signed by Seljan. *Id.* at 1079. A portion of the form labeled "Required Signature" stated, "Use of this Air Waybill constitutes your agreement to the Conditions of Contract on the back of this Air Waybill." These conditions included the following provision: "Right to Inspect. Your shipment may, at our option or at the request of governmental authorities, be opened and inspected by us or such authorities at any time." *Id.* Seljan understood that the packages had to "clear customs" before leaving the United States. *Id.*

On November 21, 2002, U.S. Customs Service[1] inspectors searched packages bound for the Philippines as part of a currency interdiction operation[2] at the FedEx regional sorting facility in Oakland, California. *Id.* at 1079-80. Customs Inspector Phil Oliva opened a package sent by Seljan. Inside were return address labels for Seljan's post office box and two envelopes, the first of which contained a $100 bill in U.S. currency and a pamphlet for a hotel in Bangkok, and the second of which contained a one-page letter and a 500 peso note in Philippine currency. *See id.*; Rep.'s Tr. of Trial Proceedings 23 (Nov. 16, 2004). The letter contained sexually suggestive language and appeared to be addressed to an eight-year-old girl.[3]

---

[1]The Customs Service was reorganized as the Bureau of Customs and Border Protection in 2003. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 1502, 116 Stat. 2135, 2308 (codified at 6 U.S.C. § 542); Department of Homeland Security Reorganization Plan, H.R. Doc. No. 108-32 (2003).

[2]Customs inspectors have authority under 31 U.S.C. § 5317(b) to inspect packages at the border for violations of 31 U.S.C. § 5316, which prohibits cross-border transportation of undeclared currency or monetary instruments worth more than $10,000.

[3]The letter reads as follows (grammar and spelling errors in original):

My Dear [redacted]:

I received your letter, but you did not date your letter. Yes, Honey, I like little girls like you, but you did not send me a picture of your-self.

*See Seljan*, 328 F. Supp. 2d at 1079-80. After Inspector Oliva notified his superiors, customs officials photocopied the package's contents and allowed FedEx to deliver it. *Id.* at 1080.

Customs inspectors at the Oakland facility intercepted a second package from Seljan on August 3, 2003. *Id.* This package contained approximately $200 in U.S. currency, adult pornography, and two letters. This time, the two letters were more sexually explicit than the November 2002 letter. One letter appeared to be addressed to the same eight-year-old girl as the previous letter, while the other letter was addressed to another girl's mother. *Id.* After opening the package and seeing the pornography and letters, Customs Inspector Shawn Mohr alerted his supervisor, Inspector Tom LeBlanc, who recognized Seljan's name from the November 2002 search. Again, the inspectors copied the contents and allowed FedEx to deliver the package. *Id.*

Andrew Vincik, a Special Agent of the Bureau of Immigration and Customs Enforcement ("ICE"), then began to investi-

---

I wonder who helped you write that letter to me. For only 8 yrs old, you do have a very nice handwritting.

To-day we are sending a large box of many things for the whole family. In that box is some candy and a special [indiscernible] of Chocalate for you and it has your name on the box, so please let me know that you received this box.

I'm not coming to Manila in December and I'm not sure when I'll be coming, But I'll let you know the date for sure, Coz I do want to see you, so please send me a picture of your-self in your next letter. I know at your age that your "PEANUT" smells like "SWEET" Roses. That box cantens lots of clothes and some might fit you.

Here's P500.00 for some extra things that you need.

Now, I'll wait for your answer real soon.

Lots of Love & more.
Johnnie.

All the girls I know call me "JOHNNIE" that keeps me young.

gate Seljan. *Id.* After interviewing the property manager for Seljan's former residence as well as one of Seljan's former neighbors, Agent Vincik learned that Seljan had spoken of traveling to the Philippines to "have sex with kids." *Id.* Agent Vincik determined that Seljan had traveled to the Philippines forty-three times between 1992 and 2003. *Id.*

On September 27, 2003, customs inspectors at the Oakland facility searched a third FedEx package sent by Seljan and addressed to someone in the Philippines. *Id.* This package contained nine photocopied letters, $100 in U.S. currency, non-pornographic photos of Seljan with minors, and adult pornography. *Id.* at 1080-81. The letters described Seljan's desire to engage in sex acts with the children to whom the letters were addressed. *Id.* Seljan had addressed one letter to the recipient of the November 2002 letter. *Id.* This time, inspectors copied the contents but withheld the package from delivery. *Id.* at 1081.

On October 3, 2003, Seljan arrived at Los Angeles International Airport and checked baggage for Philippines Air Flight 103, traveling to Manila. *Id.* ICE agents stopped Seljan before he boarded the plane. *Id.* The agents searched his luggage, discovering adult pornographic magazines, a child pornographic book, letters written by Seljan, and fifty-two photographs of Seljan engaged in sex acts with Filipino children. *Id.*

Seljan signed a *Miranda* waiver and made several incriminating statements. *Id.* According to the agents, he said he had been "sexually educating" children for about twenty years. He also said the children's ages ranged from eight to thirteen, and that he intended to "sexually educate" children on the present trip as well. After his arrest, customs agents executed a search warrant at his residence and discovered adult pornography, a fiction book about pedophilia and incest, a typewriter, and various business and travel documents. *Id.*

On July 28, 2004, a federal grand jury in the Central District of California returned a third superseding indictment charging Seljan with one count of attempted travel with intent to engage in illicit sexual conduct, a violation of 18 U.S.C. §§ 2423(b) and (e); two counts of use of an interstate facility to entice a minor to engage in criminal sexual acts, a violation of 18 U.S.C. § 2422(b); two counts of production of child pornography, a violation of 18 U.S.C. § 2251(a); and two counts of possession of child pornography, a violation of 18 U.S.C. § 2252A(a)(5)(B).

On February 2, 2004, Seljan filed a motion to suppress all evidence discovered as a result of the searches of his FedEx packages. He argued that the warrantless search of these packages did not fall under any exception to the Fourth Amendment warrant requirement. At a minimum, he asserted, these were "extended border searches" that must be supported by reasonable suspicion. Seljan also contended that the scope of the package searches was unreasonable.

Following an evidentiary hearing, the district court denied Seljan's motion to suppress. The district court held that inspections at the Oakland facility were "tantamount to an inspection at the international border." *Seljan*, 328 F. Supp. 2d at 1083. In the alternative, the district court held that Seljan had consented to these searches by agreeing to the conditions on the air waybills, and that the scope and conduct of the searches were reasonable. *Id.* at 1085

At the conclusion of a three-day bench trial, the district court found Seljan guilty of all counts except one child pornography production charge. On March 28, 2005, the district court imposed sentence. Citing the defendant's age, the district court gave sentence of 240 months—22 months lower than the bottom of the applicable Guidelines range. The district court also sentenced Seljan to a life term of supervised release and a $600 assessment. When the district court imposed sentence, Seljan was eighty-seven years old.

This timely appeal followed.

## II.  MOTION TO SUPPRESS

Seljan challenges the district court's denial of his motion to suppress all evidence discovered as a result of customs inspections of the Philippines-bound packages he sent through FedEx. Seljan focuses on the first search, which occurred on November 21, 2002. He contends that the customs inspectors violated his Fourth Amendment rights when they opened the package and read the enclosed letter without reasonable suspicion that opening the package or reading the letter would reveal contraband or uncover evidence of criminal activity. Seljan challenges the later searches as tainted fruits of this initial allegedly unlawful inspection.

The government offers two justifications for the November 2002 search. First, it defends the search as one occurring at the functional equivalent of the international border, contending that the search was reasonable in scope and manner.[4] Second, the government claims that Seljan consented to the search by signing the FedEx air waybill.[5]

We follow our holding in *United States v. Abbouchi*, ___ F.3d ___, No. 05-50962, 2007 WL 2027358 (9th Cir. 2007), that customs searches at hubs like the Oakland FedEx regional sorting facility take place at the functional equivalent of the border. *Abbouchi*, at *2-*4.

---

[4]A district court's ruling on the legality of a border search is reviewed de novo. *United States v. Ani*, 138 F.3d 390, 391 (9th Cir. 1998). A district court's findings of fact are reviewed for clear error. *United States v. Mendoza-Ortiz*, 262 F.3d 882, 885 (9th Cir. 2001).

[5]Because we hold that the border searches of the FedEx packages were constitutionally valid, we do not review the district court's alternative ground for denying the motion to suppress that Seljan consented to the searches by signing the airway bill that contained the Right to Inspect provision.

"The border search doctrine is a narrow exception to the Fourth Amendment prohibition against warrantless searches without probable cause." *United States v. Sutter*, 340 F.3d 1022, 1025 (9th Cir. 2003). Under this doctrine, customs officials routinely conduct searches at the international border to identify the illegal transportation of contraband or undeclared articles across the border. *See United States v. Alfonso*, 759 F.2d 728, 737 (9th Cir. 1985). Such border searches are grounded in the government's right to protect the United States' territorial integrity by examining persons and property entering and leaving the country,[6] and " 'are reasonable simply by virtue of the fact that they occur at the border.' " *United States v. Flores-Montano*, 541 U.S. 149, 152-53 (2004) (quoting *United States v. Ramsey*, 431 U.S. 606, 616 (1977)); *see also United States v. Cortez-Rocha*, 394 F.3d 1115, 1118-19 (9th Cir.), *cert. denied*, 126 S. Ct. 206 (2005). As a consequence, searches at the international border require neither a warrant nor individualized suspicion. *See Sutter*, 340 F.3d at 1025.

Even at the border or its functional equivalent, however, the Fourth Amendment imposes some limits on governmental authority. Searches at the border must still be reasonable in scope and manner. *See United States v. Duncan*, 693 F.2d 971, 977 (9th Cir. 1982). We evaluate reasonableness by examining three factors: "[t]he scope of the intrusion, the manner of its conduct, and the justification for its initiation." *Id.*

---

[6]The border search standard applies equally to searches of persons or property leaving the United States as to those entering the country. *United States v. Cardona*, 769 F.2d 625, 629 (9th Cir. 1985) ("The fact that this case involves an exit search does not alter our analysis. Since the border search exception applies to exit searches, there is no principled basis to conclude that the extended border search doctrine does not apply with equal force to exit searches as it does to entry searches.")

## A.  Justification for the Search

Seljan contends, based on 19 U.S.C. § 1583, that Inspector Oliva's opening of the sealed envelope inside the FedEx package and his examination of the letter's contents were improper because Inspector Oliva had no reasonable suspicion that the sealed envelope contained contraband.

**[1]** We reject Seljan's theory that the inspection was conducted under the authority of 19 U.S.C. § 1583, which requires that customs officials have reasonable suspicion to open sealed envelopes in outbound mail carried by the U.S. Postal Service.[7] The district court found that on November 21, 2002, customs inspectors were conducting an outbound currency interdiction operation targeting packages bound for the Philippines to determine if the sender was exporting currency in violation of 31 U.S.C. § 5316. *See Seljan*, 328 F. Supp. 2d at 1079. These interdiction efforts are authorized under 31 U.S.C. § 5317(b), which provides that "a customs officer may stop and search, at the border and without a search warrant, any vehicle, vessel, aircraft, or other conveyance, *any envelope or other container*, and any person entering or departing from the United States." *Id.* (emphasis added). Notwithstanding the standard under 19 U.S.C. § 1583, § 5317(b) granted separate and independent authority to Inspector Oliva to open both envelopes contained in the FedEx package.

---

[7]Section 1583 provides that customs officials at the border may conduct a warrantless search of "mail of domestic origin transmitted for export by the United States Postal Service and foreign mail transiting the United States that is being imported or exported by the United States Postal Service." 19 U.S.C. § 1583(a)(1). The statute likewise permits outgoing mail to be searched where the sender "has consented in writing." *Id.* § 1583(b). Customs officials may search "mail weighing in excess of 16 ounces sealed against inspection under the postal laws and regulations of the United States . . . if there is reasonable cause to suspect that such mail contains" contraband, *see id.* § 1583(c)(1), with the limitation that no inspector "shall read, or authorize any other person to read, any correspondence contained in mail sealed against inspection[,]" absent a search warrant or express written consent for the reading. *Id.* § 1583(c)(2).

**[2]** Based on the record, the district court did not err in finding the search was authorized under 31 U.S.C. § 5317, and not 19 U.S.C. § 1583. Despite an unattributed "customs report" cited by Seljan that the random package inspection was conducted in part under 19 U.S.C. § 1583, Inspector LeBlanc testified that neither he nor any member of his team was involved in preparing such a report. *See* Rep.'s Tr. of Trial Proceedings 52-53 (May 10, 2004). Inspector LeBlanc also testified that he did not instruct his team during the November 21, 2002 operation that their currency interdiction inspections were authorized under 19 U.S.C. § 1583. *See id.* at 53-55. This testimony is supported by the legal premise that the import of section 1583 is irrelevant because of the distinct grant of suspicionless search authority under 31 U.S.C. § 5317. *Cf. Sutter*, 340 F.3d at 1025 (The border search exception is "codified at 19 U.S.C. §§ 1581 and 1582, [authorizing] 'routine searches of persons and their effects entering the country [to] be conducted without any suspicion whatsoever.' ") (quoting *United States v. Molina-Tarazon*, 279 F.3d 709, 712 (9th Cir. 2002)); *United States v. Pringle*, 576 F.2d 1114, 1115-18 (5th Cir. 1978) (rejecting defendant's contention that search of inbound package from Thailand required "reasonable cause to suspect" unlawfulness under 19 U.S.C. § 482 where 19 U.S.C. § 1582 codified suspicionless search of all mail at the border) (citing *Ramsey*, 431 U.S. at 616-25).

**[3]** Moreover, even if Inspector Oliva mistakenly believed he was operating under 19 U.S.C. § 1583, a government official's subjective belief is immaterial to our Fourth Amendment inquiry where the border search was grounded in the objective authority under 31 U.S.C. § 5317. *See Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000); *United States v. Bowhay*, 992 F.2d 229, 231 (9th Cir. 1993) ("When the police conduct would have been the same regardless of the officer's subjective state of mind, no purpose is served by attempting to tease out the officer's 'true' motivation.").

**[4]** In evaluating the justification for the search here, we stress that the government's interest in protecting its territorial integrity is at its "zenith" at the border, *Flores-Montano*, 541 U.S. at 152, and every Congress since the first one "has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). In other words, the government's justification for broad search authority is its interest in regulating the flow of persons and property across the border. A judicious scrutiny of the search of the November 2002 package must consider the extent to which the suspicionless inspection of Seljan's correspondence furthered the government's interest in regulating the flow of persons and property across the border. Viewed in this light, the justification for the search of the FedEx package at the functional equivalent of the border is strong.

## B.   Manner and Scope of the Search

Seljan argues that the search, regardless of its authorization, was unreasonably intrusive in manner and scope because, upon opening the FedEx package and examining the size and appearance of the letter contained within the package, it should have been clear, without having to read the letter's content, that the FedEx package contained no contraband relating to undeclared currency.

**[5]** Under our precedents, we have considered only a limited number of distinct scenarios where we might invalidate a border search under the Fourth Amendment's reasonableness command because of the highly intrusive manner or scope of the search. In *United States v. Vance*, despite the border search context, we held that customs officials must have "real suspicion" that a traveler is carrying contraband before they may proceed beyond a pat-down or luggage search and

subject the traveler to a strip-search. 62 F.3d 1152, 1156 (9th Cir. 1995) (finding sufficient predicate to undertake a strip search where a traveler was returning from an unusually short trip, showed external signs of intoxication, was wearing clothing inappropriate for the climate, and had a suspicious bulge beneath his clothes); *see also United States v. Ramos-Saenz*, 36 F.3d 59, 61 (9th Cir. 1994) (concluding that a border search goes beyond the routine "only when it reaches the degree of intrusiveness present in a strip search or body cavity search"). In *Alfonso*, we held that "in the context of a border search, the search of private living quarters on a ship should require something more than naked suspicion." 759 F.2d at 738 (concluding that other evidence of drug shipments aboard vessel sufficed to justify search). In the context of vehicle searches, we have accepted the possibility that a search could conceivably be so destructive that it would exceed its reasonable scope. *See, e.g., United States v. Hernandez*, 424 F.3d 1056, 1059 (9th Cir. 2005) (dismantling internal car door panels not excessively destructive as to be unreasonable); *United States v. Chaudhry*, 424 F.3d 1051, 1053 (9th Cir. 2005), *cert. denied*, 126 S. Ct. (2006) (concluding that exploratory drilling during suspicionless vehicle search at the border was done in reasonable manner where a "single 5/16-inch hole [was] drilled in the bed of a pickup truck"). Finally, we have also considered the question of whether a prolonged detention pursuant to a suspicionless border search might be unreasonable. *See United States v. Gonzalez-Rincon*, 36 F.3d 859, 861, 863-64 (9th Cir. 1994) (holding that scope of border search was reasonable where nervous defendant arriving from Colombia was detained for several hours to monitor for bowel movements before she expelled seventy-three balloons containing cocaine).

[6] We do not conclude that the scope or manner of the customs inspection here falls into the limited category of overly intrusive searches at the border. The customs official could ascertain by a glance that evidence of pedophilia was present in personal correspondence enclosed in a FedEx package that

could be lawfully inspected. In conducting the suspicionless search under 31 U.S.C. § 5317(b), customs officials were authorized to open "any envelope." In addition, Inspector LeBlanc, Supervisory Customs Inspector and team leader during the operation, stated that "[i]n inspecting [outbound] packages, Customs inspectors adopt a two-tier approach. First, they scan, not read, any documents. If something during their scan gives them reasonable suspicion to suspect a violation of the law, the inspectors give a closer inspection to the contents of the package." Decl. Tom LeBlanc, Ex. to Gov. Opp. to Mot. to Suppress. This "scanning" protocol, not required under § 5317(b), provided a second layer of protection against over-intrusive searches.

[7] During the course of this inspection, Inspector Oliva testified that he adhered to the scanning protocol when inspecting Seljan's FedEx package and the second enclosed envelope:

> A:   . . . I opened up the second letter, and I scanned the letter that was in the second envelope.
>
> Q:   Did you notice anything during your scan?
>
> A:   I was reading as I was scanning. I caught a couple of sentences on there, something about an eight-year-old girl, something about "I love you," and there was a final sentence at the bottom stating that . . .
>
>     . . . .
>
>     . . . "little girl's peanuts smells like roses," and at that time I reread the letter thoroughly to understand what the letter was saying.

Rep.'s Tr. of Trial Proceedings 23, 25 (Nov. 16, 2004). Inspector Oliva's method of "scanning," even though it

included reading a few words by necessity, was reasonable under the Fourth Amendment. In contrast to the limitation on reading correspondence under 19 U.S.C. § 1583(c)(2), there is no similar prohibition under 31 U.S.C. § 5317(b), which authorized the search.

[8] More significantly, we cannot reasonably expect customs officials like Inspector Oliva wholly to abandon their sensory faculties when conducting inspections under the plenary authority of a border search. On the facts here, Inspector Oliva did not act contrary to objective reasonableness. Although he was checking for compliance with currency declaration requirements under 31 U.S.C. § 5316, according to his testimony, no more than a glance was necessary to detect evidence of pedophilia. This testimony is not surprising because the letter in the first paragraph unabashedly announces its author's illegal proclivities: "Yes, Honey, I like little girls like you." We refuse to impose an unworkable and unreasonable constraint on the nation's customs officials by requiring that they avert their eyes from obvious unlawfulness.[8]

We find support for our conclusion from our precedents involving the plain view doctrine. "An example of the applicability of the 'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character." *Coolidge v. New*

---

[8]In a different context, it is not difficult to imagine that such an imprudent constraint could have disastrous consequences: To avoid detection, a terrorist could simply enclose in a separate sealed envelope within the FedEx package plans for an explosive device, instructions for an attack, the chemical formula for some form of poison, or any other type of document that could, under Seljan's proposed rule, qualify as unsearchable. Not only is such a rule unsupported under the law, it is unwise. *See Cortez-Rocha*, 394 F.3d at 1123-24 (underscoring "importance of our policing borders . . . which at this juncture in our history is surely a pressing national special need" in view of the findings of the 9/11 Commission on terrorist travel) (internal quotation marks omitted).

*Hampshire*, 403 U.S. 443, 465 (1971) (plurality opinion), *abrogated on other grounds as recognized by United States v. Ewain*, 88 F.3d 689, 693 (9th Cir. 1996). In *United States v. Bulacan*, we observed that warrantless seizures are constitutional under the plain view doctrine in situations where "the incriminating nature of the object must be immediately apparent and the officer must 'have a lawful right of access to the object itself.' " 156 F.3d 963, 968 (9th Cir. 1998) (quoting *Horton v. California*, 496 U.S. 128, 137 (1990)). In that case we noted that "[t]he initial intrusion can be justified by a warrant *or by one of the recognized exceptions of the warrant requirement.*" *Id.* (emphasis added); *see also Coolidge*, 403 U.S. at 465 ("Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate."). In *Bulacan*, we held a regulation authorizing administrative searches at the entrance of a federal building, premised on protecting the safety of its occupants, to be unconstitutional because it was applied to not only weapons and explosives, but also narcotics, alcohol and gambling devices. *Id.* at 967, 973-74. Because narcotics, alcohol and gambling devices posed no immediate threat to the building's occupants, the officer's initial search of the defendant's bag under the regulation that resulted in the seizure of narcotics and drug paraphernalia was invalid. *See id.* at 973-74. Because the search was not legitimately initiated, the *Bulacan* court concluded that the plain view doctrine was inapplicable. *See id.* at 968-69, 973-74.

Significantly, in *Bulacan*, we distinguished our invalidation of a dual-purpose administrative search from *United States v. Soto-Camacho*, 58 F.3d 408 (9th Cir. 1995), and *United States v. Watson*, 678 F.2d 765 (9th Cir. 1982), both of which involved constitutional suspicionless administrative searches that featured a secondary rationale to monitor criminal activity. In *Watson*, marijuana was discovered when the U.S. Coast Guard was conducting an administrative search of the Globe Trotter, a vessel that fell within the parameters of an adminis-

trative plan that permitted Coast Guard personnel "to board and inspect all United States vessels less than 200 feet in length found in specific windows or corridors located at established points in the Pacific." *See* 678 F.2d at 766. The sole purpose of the search in accordance with this administrative plan was to inspect for compliance with document and safety regulations; yet the government conceded that the search was also conducted "to attempt to interdict the flow of marijuana." *Id.* at 766, 769 (internal quotation marks omitted). The *Watson* court rejected defendants' dual motive argument —that the random search was also motivated by criminal law enforcement concerns and thus the Coast Guard required a search predicate—because "the stop and search had an independent administrative justification, and did not exceed in scope what was permissible under that administrative justification." *Id.* at 771.

In *Soto-Camacho*, the defendant challenged the admissibility of drugs seized pursuant to an administrative search conducted at a border checkpoint whose primary purpose was to prevent the flow of undocumented immigrants into the United States, yet where the border patrol timed the activation of the checkpoint based in part on intelligence regarding the movement of drugs. *Id.* at 410-11. As in *Watson*, the search was legitimate at the outset because it had independent justification and " 'did not exceed in scope what was permissible under that administrative justification.' " *Id.* at 412 (quoting *Watson*, 678 F.2d at 771). Our decision in *Bulacan* was compelled to distinguish these cases, *see* 156 F.3d at 971-73, because they provided examples of suspicionless searches that were validly initiated such that narcotics contraband discovered incidental to the main purpose of the administrative search could not be suppressed.[9]

---

[9]*Bulacan* distinguished *Watson* and *Soto-Camacho* by focusing on the fact that both of those cases dealt with the border context, while *Bulacan* did not. *Bulacan*, 156 F.3d at 971-73. That distinction cannot, of course, be drawn here.

In light of this authority, we hold that Inspector Oliva's search of the letter inside the second envelope was not unreasonably intrusive in terms of its scope. Like the searches in *Watson* and *Soto-Camacho*, Inspector Oliva was authorized to open the FedEx package and "any" particular envelopes contained within. *See* 31 U.S.C. § 5317(b). This statutory authority provided the basis for Inspector Oliva to have a "lawful right of access to the object" to be searched, *i.e.* the FedEx package and all the enclosed contents. *See Horton*, 496 U.S. at 137. In determining the subject matter of the letter, Inspector Oliva appropriately scanned the document and could not have avoided noticing the "immediately apparent" evidence of pedophilia. *See Bulacan*, 156 F.3d at 968. Thus the manner of the search, too, was not unreasonable.

That the letter contained Seljan's intimate and illicit thoughts is of little significance since Seljan has only a very limited expectation of privacy during a border search. *See Flores-Montano*, 541 U.S. at 154 (noting that "the expectation of privacy is less at the border than it is in the interior"); *Ramsey*, 431 U.S. at 623 n.17 ("Not only is there the longstanding, constitutionally authorized right of customs officials to search incoming persons and goods, . . . there is no statutorily created expectation of privacy[.]"); *Bulacan*, 156 F.3d at 973 ("The Government's interests in preventing the entry of contraband at the border is substantial, and the protections of the Fourth Amendment are weakened.") (citing *Watson*, 678 F.2d 765, and *Soto-Camacho*, 58 F.3d 408). In the context of a border search, moreover, we do not draw an artificial line at the sealed envelope within a package. *See Montoya de Hernandez*, 473 U.S. at 537 (recognizing that customs authorities have "plenary authority" to execute searches to interdict contraband); *Ramsey*, 431 U.S. at 619-20 (rejecting lower court's theory that suspicionless search authority does not extend from travelers' luggage and sent packages to "mailed letter-sized envelopes") (internal quotation marks omitted).

The scope and manner of the search of the letter was constrained, as the letter had to be scanned when the package was

opened, and the evidence of pedophilia presented itself. The review of the FedEx package's contents is nothing like an intrusive body search or the dismantling of a car. The search of the FedEx package was reasonable in manner and scope.

**[9]** We conclude that the district court did not err in finding that the initial search here was reasonable. The unmistakable evidence of pedophilia, which fell within the plain view of Inspector Oliva, permitted him to ascertain the full import of the letter and, in a temporary seizure, to bring the package's contents to the attention of his superior, Inspector LeBlanc, who in turn properly documented the contraband and the identity of Seljan.

## III. SENTENCING

We turn to the sentencing issues raised by Seljan.

Seljan appeals several aspects of his 240-month sentence. He first challenges the Presentence Report's recommendation that several counts of the indictment be added up individually rather than grouped for purposes of calculating the "Multiple Count Adjustment." Seljan also claims the district court did not adequately consider his advanced age when imposing sentence. Finally, Seljan contends that the district court gave undue weight to his past sexual abuse conviction, thereby elevating his criminal history category. We conclude that none of these contentions warrants resentencing.[10]

---

[10]Seljan's ultimate sentence is reviewed for "reasonableness." *United States v. Booker*, 543 U.S. 220, 261 (2005). We review the district court's interpretation of the Sentencing Guidelines de novo, the district court's application of the Sentencing Guidelines to the facts of a case for an abuse of discretion, and the district court's factual findings for clear error. *See United States v. Kimbrew*, 406 F.3d 1149, 1151 (2005).

## A.  Grouping of Counts

Seljan contends that the district court failed to group the charges in Count One (attempted travel with intent to engage in illicit sexual conduct with a minor) and Counts Two and Three (using a facility of interstate and foreign commerce to entice a minor to engage in sexual activity). The district court declined to group these offenses because it concluded that the counts involved different victims with different ages.[11]

Seljan's claim that some grouping is appropriate may be correct. United States Sentencing Guidelines Manual ("U.S.S.G.") section 3D1.2 provides that counts that "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan" may be grouped. U.S.S.G. § 3D1.2(b) (2002). Count One alleges attempted travel with intent to engage in criminal sexual activity with victims "Em Em" and "Janel." Count Two alleges use of facilities of interstate and foreign commerce to entice victim "Em Em" into sexual activity, and Count Three alleges enticement of victim "Janel." Thus, Counts One and Two share a common victim, and Counts One and Three share a different common victim.

Seljan's attempted travel to the Philippines (alleged in Count One) and the packages sent to the victims seeking to entice them into illicit sexual activity (alleged in Counts Two and Three) arguably involve the same composite harm to each minor victim and are connected by a common criminal objective or plan. *See* U.S.S.G. § 3D1.2 cmt. n.4. Thus, it may be appropriate to combine the three counts into two groups: one for the conduct against the victim common to Counts One and

---

[11]Sentencing Guidelines Manual section 3D1.4 accounts for multiple offenses at sentencing by imposing an offense level enhancement, the size of which depends on a weighted sum of grouped counts and individual counts. *See* U.S.S.G. § 3D1.4.

Two, and the other for conduct against the victim common to Counts One and Three.[12]

**[10]** Even if Seljan is correct, however, he is not entitled to relief. Assuming the first three counts should be consolidated into two groups for purposes of applying U.S.S.G. § 3D1.4, this is only a net reduction of one unit. With one unit for Counts Six and Seven (which were grouped below) and another for Count Four, the total units for purposes of applying section 3D1.4 is four. This would still result in a four-level increase in offense level, the same amount imposed by the district court. *See* § 3D1.4 (prescribing a four-level increase for three-and-a-half to five units). Any error by the district court was harmless.

## B.   Advanced Age

**[11]** Seljan argues that the district court did not adequately consider his advanced age. This argument is meritless. The district court acknowledged that his age and health reduced the likelihood of recidivism and addressed Seljan's concern that the sentence was tantamount to life imprisonment. The district court even considered the sentence that a defendant without a prior conviction would receive. Indeed, the district court's sentence was twenty-two months below the low end of the Guidelines range. Seljan argues only that the reduction should have been even greater. On this record, however, the district court's sentence was reasonable.

## C.   Effect of Seljan's Prior Conviction

Finally, Seljan argues that the district court gave too much

---

[12]It does not matter that the government failed to separate the allegations in Count One, which names two victims, into two separate counts. *See United States v. Calozza*, 125 F.3d 687, 689-90 (9th Cir. 1997) (holding that the purpose of the grouping provisions is to prevent prosecutors from enhancing sentences by manipulating the counts charged).

weight to the Guidelines by applying a criminal history category of V pursuant to Guidelines section 4B1.5(a)(2), which provides for sentencing of "[r]epeat and [d]angerous [s]ex [o]ffender[s] [a]gainst [m]inors."

**[12]** No party seriously disputes that Seljan's 1977 Wisconsin conviction qualifies as a "sex offense conviction" under section 4B1.5. Rather, Seljan argues that because criminal history is primarily relevant as an indicator of future recidivism, the district court should have disregarded the elevated criminal history category in light of his age and low actual likelihood of recidivism. If, however, the district court had simply disregarded the prescription of section 4B1.5, it would have violated our rule that the district court properly calculate the Guidelines range before deciding whether such a sentence is reasonable. *See United States v. Cantrell*, 433 F.3d 1269, 1280 (9th Cir. 2006). Moreover, the court *did* consider the impact of Seljan's age on his likelihood of recidivism, and adjusted the sentence accordingly. Nothing in the record compels us to tinker any further.

## IV.    CONCLUSION

**[13]** We hold that customs officials acting under authority of 31 U.S.C. § 5317(b) may search the full contents of any package, container or other object to be searched, even if that package, container or other object serves to enclose smaller envelopes or other wrapped or sealed objects. Where personal correspondence or other documents indicate evidence of contraband or other criminal activity that is immediately apparent to the inspecting official, those items too may be searched even though said evidence may not relate to the interdiction of undeclared currency. To unreasonably constrain customs operations from searching and seizing obviously incriminating materials would be inconsistent with our jurisprudence under the plain view doctrine.

For the reasons stated, we also hold that the district court's sentence was reasonable.

**AFFIRMED.**

---

PREGERSON, Circuit Judge, concurring in part and dissenting in part:

I join Parts I and III of the per curiam opinion, and I agree that the searches at issue took place at the functional equivalent of the border. I disagree, however, with Part II of the opinion, which upholds the suspicionless search of Seljan's FedEx packages. I do not believe that the Fourth Amendment permits federal customs inspectors acting without reasonable suspicion to read what is obviously a person's letters or papers merely because the inspector finds those items in a package destined to cross the U.S. international border.

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, *papers*, and effects." U.S. Const. amend. IV (emphasis added). The border search doctrine is a narrow exception the Fourth Amendment prohibition against warrantless searches without probable cause." *United States v. Sutter*, 340 F.3d 1022, 1025 (9th Cir. 2003). However, although "the expectation of privacy is less at the border than it is in the interior," *United States v. Flores-Montano*, 541 U.S. 149, 154 (2004), privacy is not extinguished entirely.

Any rule allowing government officials to read private papers without individualized suspicion risks serious intrusions on privacy. People send many types of documents through FedEx and other express consignment services: diaries, letters, materials protected by the attorney-client and attorney work-product privileges, trade secrets, medical records, and financial records. *Cf. United States v. Arnold*, 454 F. Supp. 2d 999, 1003-04 (C.D. Cal. 2006). The mere fact that these items cross an international border does not give customs officials absolute license to read their contents.

The majority's position subjects letters enclosed in FedEx packages with foreign destinations to examination even though they would be shielded from government review if the recipients lived in the United States. A woman in Los Angeles could send without fear of government snooping a letter to a friend in Boston, but not to her mother in Mexico City. Suspicionless searches of documents sent to and from attorneys also raise troubling issues. Many materials sent through FedEx contain confidential client information or are protected by the work-product and attorney-client privileges. By sending a package containing client files to Canada, does an attorney waive these privileges?

The majority would uphold the search of Seljan's FedEx packages because the letter was within the customs inspector's plain view. Maj. Op. at 9853. But looking at a piece of paper is not the same as reading its contents. Moreover, I disagree with the majority's assessment that the criminality of the letter was "immediately apparent." Maj. Op. at 9854, 9856. Only by reading individual lines carefully can a reader find any hint of wrongdoing or base intentions.[1]

What *was* immediately apparent is that the paper was personal correspondence. It was formatted like an informal letter and displayed a large cartoon character. Inspector Oliva, at a glance, could determine that the paper before him was a letter rather than contraband or a dutiable article. At that point, he should have put the letter back in its envelope. Whether we label what Oliva did next as "reading" or "scanning" — and Oliva uses both labels (in the same sentence, no less) to describe his actions — the conclusion is the same: Oliva's inspection impermissibly invaded Seljan's privacy.

The majority invokes the specter of terrorism to support its position. See Maj. Op. at 9853 n.8. This argument is undermined by the availability of another means by which terrorists

---

[1]On this point the letter speaks for itself. See Appendix A.

might transport dangerous documents — the U.S. Postal Service. For letters sent through the U.S. Postal Service, customs regulations require either written consent or a search warrant to open letters that appear to contain only correspondence. *See* 19 C.F.R. § 145.3(b). Even when sealed mail appears to contain more than correspondence, customs inspectors must have reasonable cause to open a package sent through the U.S. Postal Service. *See id.* § 145.3(a). After customs inspectors open a package under these regulations, they must always have a search warrant or written authorization from the sender to *read* any enclosed correspondence. *See id.* § 145.3(c). In short, federal regulations for U.S. mail already impose a standard more stringent than what the majority today deems an "unworkable and unreasonable constraint" on customs officials.

I do not suggest that the government may never search articles found in international packages. Rather, I would hold that the government must have reasonable suspicion that papers in a package constitute contraband or evidence of wrongdoing before officers may read the contents of those papers. Nothing prevents the government from seizing what immediately appears on its face to be child pornography or terrorist bombing plans, for example. *See United States v. Abbouchi*, No. 05-50962, ___ F.3d ___, 2007 WL 2027358, at *1-*4 (9th Cir. 2007) (upholding seizure of what customs inspectors searching a UPS package could immediately determine to be potentially fraudulent social security and resident alien cards).

For the foregoing reasons, I respectfully dissent.