**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

JOHN W. SELJAN,
          *Defendant-Appellant.*

No. 05-50236

D.C. No.
CR-03-00232-AHS

OPINION

Appeal from the United States District Court
for the Central District of California
Alicemarie H. Stotler, District Judge, Presiding

Argued and Submitted
March 27, 2008—San Francisco, California

Filed October 23, 2008

Before: Alex Kozinski, Chief Judge, and Pamela A. Rymer,
Barry G. Silverman, M. Margaret McKeown,
Raymond C. Fisher, Johnnie B. Rawlinson,
Richard R. Clifton, Consuelo M. Callahan, Carlos T. Bea,
Milan D. Smith, Jr., and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Clifton;
Concurrence by Judge Callahan;
Dissent by Chief Judge Kozinski

14791

**COUNSEL**

Jerald Brainin, Los Angeles, California, for defendant-appellant John W. Seljan.

Michael J. Raphael (argued), Assistant United States Attorney, Los Angeles, California, and Richard Y. Lee, Assistant United States Attorney, Santa Ana, California, for plaintiff-appellee United States of America.

---

**OPINION**

CLIFTON, Circuit Judge:

John Seljan appeals his conviction and sentence for multiple offenses primarily involving sexual misconduct with young children in the Philippines. Federal agents investigated Seljan after customs inspectors, conducting routine searches at a FedEx facility for unreported currency and other monetary instruments in packages being sent to foreign destinations, discovered sexually suggestive letters in packages sent by Seljan. Seljan appeals the district court's denial of his motion to suppress all evidence resulting from those searches, primarily contending that the Fourth Amendment prohibited the inspectors from examining personal correspondence without a warrant, or from doing so after they should have realized that the document being examined was not a monetary instrument. Seljan also challenges his sentence. We affirm.

## I.   Facts and Procedural History

Seljan sent packages from Southern California to the Philippines via FedEx on at least three separate dates: November 20, 2002, August 2, 2003, and September 26, 2003.[1] Seljan

---

[1]The facts related here are drawn from the findings of fact entered by the district court as part of its order denying Seljan's motion to dismiss. *United States v. Seljan*, 328 F. Supp. 2d 1077, 1078-81 (C.D. Cal. 2004).

understood that the packages had to "clear customs" before leaving the United States. Affixed to each package was an international air waybill completed and signed by Seljan. A portion of the form labeled "Required Signature" stated, "Use of this Air Waybill constitutes your agreement to the Conditions of Contract on the back of this Air Waybill." These conditions included the following provision: "Right to Inspect. Your shipment may, at our option or at the request of governmental authorities, be opened and inspected by us or such authorities at any time."

FedEx routes international packages sent from Southern California through the company's regional hub in Oakland, California, one of four FedEx regional sorting facilities in the United States. At that facility, FedEx sorts packages by destination and places all document-sized packages bound for a particular country into locked containers. If a package is inspected by U.S. Customs,[2] its agents do the inspection prior to the placement of the packages into the container. Once loaded into a container, a package is not removed until it arrives in the destination country, in this case the Philippines.

When Seljan's first package passed through the FedEx facility in Oakland on November 21, 2002, customs inspectors were searching packages bound for the Philippines as part of an outbound currency interdiction operation. The operation was aimed at detecting violations of 31 U.S.C. § 5316, which prohibits export or import of undeclared currency or other monetary instruments worth more than $10,000. As will be discussed in more detail below, customs inspectors are authorized under 31 U.S.C. § 5317(b) to open and inspect packages at the border to enforce that statute.

---

[2]The U.S. Customs Service was reorganized as the Bureau of Customs and Border Protection in 2003. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 1502, 116 Stat. 2135, 2308 (codified at 6 U.S.C. § 542); Department of Homeland Security Reorganization Plan, H.R. Doc. No. 108-32 (2003).

The FedEx package sent by Seljan was opened and examined as part of that operation. It was found to contain two envelopes and return address labels for Seljan's post office box. The first envelope contained a $100 bill in U.S. currency and a pamphlet for a hotel in Bangkok. The second contained a 500 peso note in Philippine currency and a short letter. That letter was typed on one side of a single sheet of paper, at the top of which was a cartoon figure. The letter contained sexually suggestive language and appeared to be addressed to an eight-year-old girl.[3] Customs officials photocopied the package's contents before returning it to FedEx for delivery.

---

[3]A photographic reproduction of the letter may be found at 497 F.3d 1035, at 1050, as an appendix to the dissent by Judge Pregerson to the opinion previously filed by a three-judge panel of this court. The text of the letter reads as follows (grammar and spelling errors in original):

My Dear [redacted]:

I received your letter, but you did not date your letter. Yes, Honey, I like little girls like you, but you did not send me a picture of your-self.

I wonder who helped you write that letter to me. For only 8 yrs old, you do have a very nice handwritting.

To-day we are sending a large box of many things for the whole family. In that box is some candy and a special [indiscernible] of Chocalate for you and it has your name on the box, so please let me know that you received this box.

I'm not coming to Manila in December and I'm not sure when I'll be coming, But I'll let you know the date for sure, Coz I do want to see you, so please send me a picture of your-self in your next letter. I know at your age that your "PEANUT" smells like "SWEET" Roses. That box cantens lots of clothes and some might fit you.

Here's P500.00 for some extra things that you need.

Now, I'll wait for your answer real soon.

Lots of Love & more.
Johnnie

All the girls I know call me "JOHNNIE" that keeps me young.

The second package sent by Seljan was intercepted by customs inspectors at the Oakland facility on August 3, 2003, during another outbound currency operation. This package contained approximately $200 in U.S. currency, several pages of adult pornography, and two letters. One letter appeared to be addressed to the same eight-year-old girl. It was more sexually explicit than the November 2002 letter, as it expressed Seljan's desire to engage in sex acts with the girl. The other letter was addressed to another girl's mother and stated that Seljan would be "coming back in September . . . . know [redacted]'s b-Day is September 21th she'll be XXXX 9." [errors in original] After opening the package and seeing the pornography and letters, the customs agent alerted his supervisor, who recognized Seljan's name from the November 2002 search. Again, the inspectors copied the contents and allowed FedEx to deliver the package.

An agent of the Bureau of Immigration and Customs Enforcement began to investigate Seljan. The property manager for Seljan's former residence and one of Seljan's former neighbors both told the agent that Seljan spoke of traveling to the Philippines to "have sex with kids," that he showed child pornography, and that he had bragged about his video and scrapbook collection of similar materials. The agent determined that Seljan had traveled to the Philippines forty-three times between 1992 and 2003.

Customs inspectors at the Oakland facility stopped and searched Seljan's third FedEx package on September 27, 2003. This package contained nine photocopied letters, $100 in U.S. currency, non-pornographic photos of Seljan with minors, and adult pornography. The letters described Seljan's desire to engage in sex acts with the children to whom the letters were addressed. One letter was addressed to the recipient of the November 2002 letter. The inspectors copied the contents but, this time, withheld the package from delivery.

Seljan arrived at Los Angeles International Airport and checked baggage for a flight to Manila on October 3, 2003.

Customs agents stopped him before he boarded the plane. The agents searched his luggage, discovering adult pornographic magazines, a book of child pornography, letters written by Seljan, and fifty-two photographs of Seljan engaged in sex acts with Filipino children.

Seljan signed a *Miranda* waiver and made several incriminating statements. He said he had been "sexually educating" children for about twenty years, that the children's ages ranged from eight to thirteen, and that he intended to "sexually educate" children on the trip he was there that day to take. He was not allowed to depart on that trip, however, and was placed under arrest. After his arrest, customs agents executed a search warrant at his residence and discovered adult pornography, a fiction book about pedophilia and incest, a typewriter, and various business and travel documents.

Seljan subsequently filed a motion to suppress all evidence discovered as a result of the searches of his FedEx packages. He argued that the warrantless search of these packages did not fall under any exception to the Fourth Amendment's warrant requirement. At a minimum, he asserted, these were "extended border searches" that must be supported by reasonable suspicion. Seljan also contended that the scope of the package searches was unreasonable.

Following an evidentiary hearing, the district court denied Seljan's motion to suppress. The district court held that inspections at the Oakland facility were "tantamount to an inspection at the international border." *Seljan*, 328 F. Supp. 2d at 1083. In the alternative, the district court held that Seljan had consented to these searches by agreeing to the conditions on the air waybills, and that the scope and conduct of the searches were reasonable. *Id.* at 1085.

At the conclusion of a three-day bench trial, the district court found Seljan guilty of one count of attempted travel with intent to engage in illicit sexual conduct in violation of

18 U.S.C. §§ 2423(b) and (e); two counts of use of an interstate facility to entice a minor to engage in criminal sexual acts in violation of 18 U.S.C. § 2422(b); one count of production of child pornography in violation of 18 U.S.C. § 2251(a); and two counts of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).

The district court imposed sentence on March 28, 2005. Citing the defendant's age—at the time sentence was imposed, Seljan was 87 years old—the court sentenced him to 240 months (20 years) of imprisonment. That duration was 22 months shorter than the low end of the calculated Guidelines range.

Seljan filed a timely appeal. A three-judge panel of this court affirmed, with one judge dissenting in part, regarding the denial of the motion to suppress. *United States v. Seljan*, 497 F.3d 1035 (9th Cir. 2007). By a vote of a majority of non-recused active judges, it was ordered that the case be reheard en banc and that the three-judge panel opinion not be cited as precedent. 512 F.3d 1203 (9th Cir. 2008). Upon rehearing, we affirm the judgment of the district court.[4]

## II.   Motion to Suppress

Seljan challenges the district court's denial of his motion to suppress all evidence discovered as a result of customs inspections of the Philippines-bound packages he sent through FedEx. Seljan focuses on the first search, which occurred on November 21, 2002. He contends that the customs inspectors violated his Fourth Amendment rights when they opened the package and read the enclosed letter without reasonable suspicion that doing so would reveal contraband or uncover evi-

---

[4]Much of this opinion is drawn directly from the per curiam opinion filed by the three-judge panel, primarily written by Judges Harry Pregerson and Ronald M. Gould. They were not drawn to serve on this en banc panel, but their contributions are appreciated.

dence of criminal activity. Seljan challenges the later searches as tainted fruits of this initial inspection.

The government offers two justifications for the November 2002 search. First, it defends the search as one occurring at the functional equivalent of the international border, contending that there are few, if any, limits on the government's ability to search at the border and that this search did not run afoul of any such limitations. Second, the government contends that Seljan consented to the search by signing the FedEx air waybill.[5]

[1] The customs search at the Oakland FedEx regional sorting facility took place at the functional equivalent of the border. *United States v. Abbouchi,* 502 F.3d 850, 855-56 (9th Cir. 2007). It should, therefore, be analyzed as a border search.[6]

[2] "The border search doctrine is a narrow exception to the Fourth Amendment prohibition against warrantless searches without probable cause." *United States v. Sutter*, 340 F.3d 1022, 1025 (9th Cir. 2003). Under this doctrine, customs officials may conduct searches at the international border to identify the illegal transportation of contraband or undeclared articles across the border. *See United States v. Alfonso*, 759 F.2d 728, 737 (9th Cir. 1985). Such border searches are grounded in the government's right to protect the nation's territorial integrity by examining persons and property entering and leaving the country. *United States v. Flores-Montano*, 541 U.S. 149, 152-53 (2004); *see also United States v. Cortez-Rocha*, 394 F.3d 1115, 1118-19 (9th Cir.), *cert.*

---

[5]Because we hold that the border search of the FedEx package was constitutionally valid, we do not reach the alternative ground that Seljan consented to the search.

[6]A district court's ruling on the legality of a border search is reviewed de novo. *United States v. Ani*, 138 F.3d 390, 391 (9th Cir. 1998). A district court's findings of fact are reviewed for clear error. *United States v. Mendoza-Ortiz*, 262 F.3d 882, 885 (9th Cir. 2001).

*denied*, 126 S. Ct. 105 (2005). Because searches at the international border of both inbound and outbound persons or property are conducted "pursuant to the long-standing right of the sovereign to protect itself," they generally require neither a warrant nor individualized suspicion. *United States v. Ramsey*, 431 U.S. 606, 616 (1977); *see also Sutter*, 340 F.3d at 1025; *United States v. Cardona*, 769 F.2d 625, 629 (9th Cir. 1985) ("The fact that this case involves an exit search does not alter our analysis. Since the border search exception applies to exit searches, there is no principled basis to conclude that the extended border search doctrine does not apply with equal force to exit searches as it does to entry searches.").

The Supreme Court has said that " 'searches made at the border . . . are reasonable simply by virtue of the fact that they occur at the border.' " *Flores-Montano*, 541 U.S. at 152-53 (quoting *Ramsey*, 431 U.S. at 616); *see also Cortez-Rocha*, 394 F.3d at 1118-19. Notwithstanding this broad language, the Court has also suggested that the Fourth Amendment might impose some limits on searches at the border, but it has neither spoken definitively on that subject nor clearly defined the limits, if any.

Most recently, in *Flores-Montano*, in which a warrantless border search of an automobile that included the removal and disassembly of the car's gas tank was held lawful despite the lack of reasonable suspicion, the Court noted that there are "reasons that might support a requirement of some level of suspicion in the case of highly intrusive searches of the person —dignity and privacy interests of the person being searched." 541 U.S. at 152. It concluded, however, that those reasons did not carry over to protect against the search of a vehicle. *Id.* In the same opinion, the Court acknowledged that "it may be true that some searches of property are so destructive as to require a different result," but held that the search in that case was not so destructive. *Id.* at 155-56. The Court explicitly left open, not for the first time, the question "whether, and under

what circumstances, a border search might be deemed 'unreasonable' because of the particularly offensive manner in which it is carried out." *Id.* at 154 n.2 (quoting *Ramsey*, 431 U.S. at 618 n.13).

Previously, in *United States v. Montoya de Hernandez*, 473 U.S. 531, 541 (1985), the Court held that reasonable suspicion was required to detain at the border and to search the alimentary canal of a traveler thought to have ingested balloons filled with narcotics. But the Court declined in that case to decide "what level of suspicion, if any, is required for nonroutine border searches such as strip, body cavity, or involuntary x-ray searches." *Id.* at 541 n.4.

Prior to *Flores-Montano*, we held that a border search does not require "probable cause, warrants or even suspicion" and comports with the Fourth Amendment "unless it violates 'reasonableness.' Reasonableness, when used in the context of a border search, is 'incapable of comprehensive definition or of mechanical application . . . .' The scope of the intrusion, the manner of its conduct, and the justification for its initiation must all be considered in determining whether a search comports with reasonableness." *See United States v. Duncan*, 693 F.2d 971, 977 (9th Cir. 1982) (internal citations omitted). The statements in *Duncan* and similar discussions in our other decisions may have been superseded by the Supreme Court's decision in *Flores-Montano*, which reversed a decision by our court and made clear that a showing of "reasonable suspicion" was not required simply because the search in question went beyond a "routine" search. We need not make that determination, however, because there is no conflict between our precedent and the dictates of *Flores-Montano* with respect to the issues in this case.

[3] We decline the government's invitation to decide this case by holding that, at the border, anything goes. Given the acknowledgments by the Court in *Flores-Montano* that there might be searches that are so intrusive, destructive, or offen-

sive that they would be deemed unreasonable under the Fourth Amendment, and the holding in *Montoya de Hernandez* that reasonable suspicion was needed to justify a border search and seizure as intrusive as that one, it is appropriate for us to consider the particular circumstances of this search.

The district court specifically found that Seljan's first package was opened and examined by customs inspectors when they were conducting an outbound currency interdiction operation targeting packages bound for the Philippines, checking for violations of 31 U.S.C. § 5316. *See Seljan*, 328 F. Supp. 2d at 1079. Based on the record, that finding was not clearly erroneous.[7]

As noted above, section 5316 requires that a report be filed with the Treasury Department whenever a person "transports, is about to transport, or has transported" monetary instruments worth more than $10,000. The provision explicitly covers instruments transported either way—both exported from and imported into the United States. "Monetary instruments" means more than currency. The term is defined, in regulations authorized under 31 U.S.C. § 5312(a)(3), to include:

> (i) Currency;
>
> (ii) Traveler's checks in any form;
>
> (iii) All negotiable instruments (including personal checks, business checks, official bank checks, cashier's checks, third-party checks, promissory notes (as

---

[7]Before the three-judge panel, Seljan contended that the customs inspection was conducted under the authority of 19 U.S.C. § 1583, which requires that customs officials have reasonable suspicion to open sealed envelopes in outbound mail carried by the U.S. Postal Service. Seljan did not press that claim before the en banc panel. He acknowledged that the inspectors were authorized under 31 U.S.C. § 5317(b) to open the package, but argued that it was nonetheless a violation of the Fourth Amendment for the inspectors to read the letter.

that term is defined in the Uniform Commercial Code), and money orders) that are either in bearer form, endorsed without restriction, made out to a fictitious payee (for the purposes of § 103.23), or otherwise in such form that title thereto passes upon delivery;

(iv) Incomplete instruments (including personal checks, business checks, official bank checks, cashier's checks, third-party checks, promissory notes (as that term is defined in the Uniform Commercial Code), and money orders) signed but with the payee's name omitted; and

(v) Securities or stock in bearer form or otherwise in such form that title thereto passes upon delivery.

31 C.F.R. § 103.11 (u)(1).

**[4]** The customs interdiction operation was explicitly authorized under 31 U.S.C. § 5317(b), which provides: "For purposes of ensuring compliance with the requirements of section 5316, a customs officer may stop and search, at the border and without a search warrant, any vehicle, vessel, aircraft, or other conveyance, *any envelope or other container*, and any person entering or departing from the United States." *Id.* (emphasis added)*; see also United States v. Gomez-Osorio*, 957 F.2d 636, 643 (9th Cir. 1992).

More broadly, and separate from the statutory authority for the particular inspection here, the government has the authority to search at the border "based on its inherent sovereign authority to protect its territorial integrity." *Torres v. Puerto Rico*, 442 U.S. 465, 472-73 (1979); *see Flores-Montano*, 541 U.S. at 152; *Ramsey,* 431 U.S. at 620. Every Congress since the founding of our government, including the Congress that first proposed the Fourth Amendment, "has granted the Executive plenary authority to conduct routine searches and sei-

zures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *Montoya de Hernandez*, 473 U.S. at 537; *see Ramsey*, 431 U.S. at 616-19.

The government's authority to conduct border searches is justified by its interest in regulating the flow of persons and property across the border. The government has an obvious interest in enforcing section 5316.

Seljan argues that the search, regardless of its authorization, was unreasonably intrusive in its scope because it entailed reading his personal correspondence. Seljan further objects to the search because he contends that it should have been clear to the customs agent, without having to read the letter, that the FedEx package contained no undeclared currency or other contraband.

The concerns identified by the Supreme Court are not present here. The search did not involve the destruction of property, it was not conducted in a "particularly offensive manner," and it was not a "highly intrusive search[ ] of the person." *Flores-Montano*, 541 U.S. at 152, 154 n.2, 155-56 (internal quotation marks omitted). There was no destruction of property. The first FedEx package, the target of Seljan's motion to suppress, was returned to FedEx for delivery and presumably reached its destination in good order. Nor was the search conducted in an manner that could be categorized as "particularly offensive." *See Ramsey*, 431 U.S. at 618 n.13. *Ramsey* suggested that a border search might be unreasonable "because of the particularly offensive manner in which it is carried out," citing as examples searches that were held unreasonable in *Kremen v. United States*, 353 U.S. 346 (1957) (officers, without a search warrant, seized the entire contents of a cabin and took the items 200 miles away to be examined), and *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 356-58 (1931) (Officer falsely claimed to have a search warrant and then "made a general and apparently unlimited

search, ransacking the desk, safe, filing cases, and other parts of the office. It was a lawless invasion of the premises and a general exploratory search in the hope that evidence of crime might be found."). There was nothing like that here.

The concern in this case is simply with how far the search went—whether it was too intrusive in scope. We agree with Seljan that there was intrusion into his privacy, but the degree of intrusion must be viewed in perspective. Seljan voluntarily gave the package containing the letter to FedEx for delivery to someone in the Philippines, with knowledge that it would have to cross the border and clear customs. The reasonable expectation of privacy for that package was necessarily tempered. When the Supreme Court spoke of "highly intrusive searches" in *Flores-Montano*, it expressly referred to "highly intrusive searches of the person" which raised concern based on the "dignity and privacy interests of the person being searched," and made the point that this concern was not triggered by a search of the person's vehicle. 541 U.S. at 152. The reference in *Flores-Montano* to "highly intrusive searches of the person" followed a discussion of *Montoya de Hernandez*, which involved an actual physical intrusion into a person's body to search the alimentary canal. In the latter case, the Court illustrated its reference to "nonroutine border searches" by citing "searches such as strip, body cavity, or involuntary x-ray searches." 473 U.S. at 541 n.4. The search of Seljan's FedEx package was substantially less intrusive than these examples.

[5] Cases in which we have considered invalidating a border search because of the highly intrusive scope or manner of the search have dealt with only a limited number of scenarios, none quite like this one. Most have been consistent with *Flores-Montano* and involved highly destructive searches of property or intrusive searches of the person. Even when we have recognized the possibility that there might be a limit on the permissible scope or manner of a given search—which discussion may have been superseded by subsequent Supreme

Court caselaw, as we noted above—we have usually concluded that the limit had not been exceeded, consistent with the Supreme Court's conclusion that the government's authority to search at the border is broad and "at its zenith." *Flores-Montano*, 541 U.S. at 152. In *United States v. Ramos-Saenz*, 36 F.3d 59, 61 (9th Cir. 1994), we concluded that a border search goes beyond the routine "only when it reaches the degree of intrusiveness present in a strip search or body cavity search" and that the search of the defendant's shoes in that case did not go beyond routine. In the context of vehicle searches, we have accepted the possibility that a search could conceivably be so destructive that it would exceed its reasonable scope, but have rejected arguments that the limit was exceeded in particular cases. *See, e.g., United States v. Hernandez*, 424 F.3d 1056, 1059 (9th Cir. 2005) (dismantling internal car door panels not excessively destructive as to be unreasonable); *United States v. Chaudhry*, 424 F.3d 1051, 1053 (9th Cir. 2005), *cert. denied*, 126 S. Ct. 1803 (2006) (concluding that exploratory drilling during suspicionless vehicle search at the border was done in reasonable manner where a "single 5/16-inch hole [was] drilled in the bed of a pickup truck"). We have also considered the question of whether a prolonged detention pursuant to a suspicionless border search might be unreasonable, without finding that it was. *See United States v. Gonzalez-Rincon*, 36 F.3d 859, 861, 863-64 (9th Cir. 1994) (holding that scope of border search was reasonable where nervous defendant arriving from Colombia was detained for several hours to monitor for bowel movements before she expelled seventy-three balloons containing cocaine).

We conclude that the customs inspection here was not overly intrusive. Even assuming that there are limits to the government's right to search packages at the border, those limits were not transgressed in this case.

[6] An envelope containing personal correspondence is not

uniquely protected from search at the border.[8] The Supreme
Court effectively rejected that contention in *Ramsey*, when it
reversed a holding of the D.C. Circuit that international letter-
class mail could not be opened without a search warrant. 431
U.S. at 608. As far as the Fourth Amendment is concerned,
mailed envelopes are covered by the border search exception,
just as envelopes carried on a traveler's person are covered:

> It was conceded at oral argument that customs offi-
> cials could search, without probable cause and with-
> out a warrant, envelopes carried by an entering
> traveler, whether in his luggage or on his person. . . .
> Surely no different constitutional standard should
> apply simply because the envelopes were mailed not
> carried. The critical fact is that the envelopes cross
> the border and enter this country, not that they are
> brought in by one mode of transportation rather than
> another. It is their entry into this country from with-
> out it that makes a resulting search "reasonable."

*Id*. at 620. We have upheld searches of similar items at the
border without warrant or particularized suspicion. *See
Abbouchi,* 502 F.3d at 855-56 (contents of a UPS package,
including a sealed envelope containing two social security
cards, two permanent resident alien cards, and handwritten
notes); *United States v. Tsai*, 282 F.3d 690, 696 (9th Cir.
2002) (contents of a traveler's briefcase and luggage); *United
States v. Grayson*, 597 F.2d 1225, 1228-29 (9th Cir. 1979)
(papers in a traveler's shirt pocket). There is no reason to pro-
tect an envelope sent via FedEx more than one that is mailed,
sent by UPS, or carried in a traveler's pocket across the bor-
der.

Seljan also argues that the customs inspectors were
required to stop their examination without reading the letter.

---

[8]We do not here consider any potential violation of the First Amend-
ment implicated by this search. *See Ramsey*, 431 U.S. at 623-24 & n.18.

Even if the inspectors were authorized to open the FedEx package and the sealed envelopes within the package, he contends that it should have been apparent to the customs agent that the letter was not currency or another monetary instrument, such that no reading was justified or permitted.

We need not decide whether *Flores-Montano* forecloses this argument, because Seljan's argument is unpersuasive on other grounds, due to the facts of his case. For one thing, the statute that affirmatively authorized the customs inspectors to open this package and envelope, 31 U.S.C. § 5317(b), does not define the limits on border searches under the Fourth Amendment. Seljan has not argued that the evidence should be suppressed because of a violation of section 5317(b), and nothing in that statute appears to have been violated in any event. Seljan has not cited authority under the Fourth Amendment that required the agents to disregard evidence of other unlawful activity, even if the unlawfulness had nothing to do with transporting unreported monetary instruments.

Moreover, the customs inspector's task here was not so simple. Although the bills turned out to be of small denominations, both of the sealed envelopes within the first FedEx parcel did in fact contain currency, so there was reason for the inspector to pause and look more carefully. In addition, many documents in addition to currency may qualify as "monetary instruments," as the definition reprinted above, at 15, demonstrates, and thus are subject to the reporting requirements of 31 U.S.C. § 5316. A simple sheet of paper could, for example, turn out to be a negotiable instrument, such as a promissory note in bearer form. The inspector could not determine that the folded paper found inside the envelope was not a monetary instrument without actually looking at what was printed there.

Nor did it take exceptional scrutiny of Seljan's one-page letter for the inspector to detect possible unlawful conduct. In

this case, evidence of possible pedophilia could be ascertained by a glance.

The experience of the customs agents here is instructive. The team leader for the interdiction operation stated that "[i]n inspecting [outbound] packages, Customs inspectors adopt a two-tier approach. First, they scan, not read, any documents. If something during their scan gives them reasonable suspicion to suspect a violation of the law, the inspectors give a closer inspection to the contents of the package." Though this "scanning" protocol was not required under section 5317(b), it provided some protection against overly intrusive searches. The inspector who examined Seljan's FedEx package testified that he adhered to the scanning protocol and that while doing so the offensive material initially became evident:

A:    . . . I opened up the second letter, and I scanned the letter that was in the second envelope.

Q:    Did you notice anything during your scan?

A:    I was reading as I was scanning. I caught a couple of sentences on there, something about an eight-year-old girl, something about "I love you," and there was a final sentence at the bottom stating that . . .

. . . .

. . . "little girl's peanuts smells like roses," and at that time I reread the letter thoroughly to understand what the letter was saying.

His method of "scanning," even though it included reading a few words by necessity, was not unreasonable. In contrast to the limitation on reading correspondence under 19 U.S.C. § 1583(c)(2), there is no similar prohibition under 31 U.S.C.

§ 5317(b), which authorized this search. Neither is there such a limitation in the Supreme Court's Fourth Amendment cases.

**[7]** We cannot reasonably expect customs officials wholly to abandon their sensory faculties when conducting inspections under the plenary authority of a border search. On the facts here, the customs inspector did not act contrary to objective reasonableness. Although he was checking for compliance with currency declaration requirements under section 5316, he did not need to read the letter carefully to detect evidence of possible pedophilia. The letter in the first paragraph suggests its author's possibly illegal proclivities: "Yes, Honey, I like little girls like you." The inspector was not required to disregard what he saw, even if it was not what he was there to look for. *See United States v. Issacs*, 708 F.2d 1365, 1369 (9th Cir. 1983). We refuse to impose an unworkable and unreasonable constraint on the nation's customs officials by requiring that they avert their eyes from obvious unlawfulness.[9]

**[8]** We find support for our conclusion from our precedents involving the plain view doctrine. "An example of the applicability of the 'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character." *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971) (plurality opinion),

---

[9]In a different context, it is not difficult to imagine that such an imprudent constraint could have disastrous consequences: To avoid detection, a terrorist could simply enclose in a separate sealed envelope within the FedEx package plans for an explosive device, instructions for an attack, the chemical formula for some form of poison, or any other type of document that could, under Seljan's proposed rule, qualify as unsearchable. Not only is such a rule unsupported under the law, it is unwise. *See Cortez-Rocha*, 394 F.3d at 1123-24 (underscoring the "importance of our policing borders . . . which at this juncture in our history is surely a pressing national special need" in view of the findings of the 9/11 Commission on terrorist travel) (internal quotation marks omitted).

*abrogated on other grounds as recognized by United States v. Ewain*, 88 F.3d 689, 693 (9th Cir. 1996). In *United States v. Bulacan*, we observed that warrantless seizures are constitutional under the plain view doctrine in situations where "the incriminating nature of the object must be immediately apparent and the officer must 'have a lawful right of access to the object itself.' " 156 F.3d 963, 968 (9th Cir. 1998) (quoting *Horton v. California*, 496 U.S. 128, 136 (1990)). In that case we noted that "[t]he initial intrusion can be justified by a warrant *or by one of the recognized exceptions of the warrant requirement.*" *Id.* (emphasis added); *see also Coolidge*, 403 U.S. at 465 ("Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate.").[10]

The customs inspector's examination of the letter inside the second envelope was, similarly, not unreasonably intrusive in its scope. The inspector was authorized to open the FedEx package and the envelopes inside it. That meant he had a "lawful right of access to the object" to be searched, *i.e.* the FedEx package and its contents. *See Horton*, 496 U.S. at 137. In the course of that authorized examination, he appropriately scanned the document and noticed the "immediately apparent" evidence of pedophilia. *See Bulacan*, 156 F.3d at 968.

---

[10]In *Bulacan*, we held a regulation authorizing administrative searches at the entrance of a federal building, premised on protecting the safety of its occupants, to be unconstitutional because it was applied to not only weapons and explosives, but also narcotics, alcohol and gambling devices. 156 F.3d at 967, 973-74. Because narcotics, alcohol and gambling devices posed no immediate threat to the building's occupants, the officer's initial search of the defendant's bag under the regulation that resulted in the seizure of narcotics and drug paraphernalia was invalid. *See id.* at 973-74. Because the search was not legitimately initiated, the *Bulacan* court concluded that the plain view doctrine was inapplicable. *See id.* at 968-69, 973-74. Significantly, in *Bulacan*, we distinguished our invalidation of a dual-purpose administrative search from *United States v. Soto-Camacho*, 58 F.3d 408 (9th Cir. 1995), and *United States v. Watson*, 678 F.2d 765 (9th Cir. 1982), both of which involved valid border searches.

The inspector's scanning of the document was not unreasonable. In *Issacs*, this court made clear that the plain view doctrine permitted "brief perusal" of a written document's contents where the inspector was authorized to examine the document. 708 F.2d at 1370. In this case, the inspector was authorized to examine the documents to determine whether they were monetary instruments. *See* 31 U.S.C. § 5317(b).

**[9]** The scope and manner of the search of the letter was constrained, as the letter had to be scanned when the package was opened to determine whether Seljan had violated 31 U.S.C. § 5316's currency reporting requirements, and the evidence of pedophilia presented itself at that time. The review of the FedEx package's contents was nothing like an intrusive body search or the dismantling of a car. The search of the FedEx package was reasonable in manner and scope.

**[10]** We conclude that the inspection of the first FedEx package was not unreasonable and did not violate the Fourth Amendment. The search was justified as a border search and as an inspection under 31 U.S.C. § 5317(b), and it was not unduly intrusive in scope or manner. The motion to suppress was properly denied by the district court, and Seljan's conviction should be affirmed.

## III. Sentencing

Seljan appeals several aspects of his 240-month sentence. He first challenges the Presentence Report's recommendation that several counts of the indictment be added up individually rather than grouped for purposes of calculating the "Multiple Count Adjustment" under the Sentencing Guidelines. He argues that the district court did not adequately consider his advanced age when imposing sentence. Finally, he contends that the district court gave undue weight to his past sexual abuse conviction, thereby elevating his criminal history category.

It is now established that "[a]ppellate review is to determine whether the sentence is reasonable; only a procedurally erroneous or substantively unreasonable sentence will be set aside." *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc). We conclude that Seljan's contentions do not warrant setting his sentence aside.

### A. Grouping of Counts

Seljan contends that the district court failed to group the charges in Count One (attempted travel with intent to engage in illicit sexual conduct with a minor) and Counts Two and Three (using a facility of interstate and foreign commerce to entice a minor to engage in sexual activity). The district court declined to group these offenses because it concluded that the counts involved different victims with different ages.[11]

Seljan's claim that some grouping is appropriate may be correct. United States Sentencing Guidelines Manual ("U.S.S.G.") section 3D1.2 provides that counts that "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan" may be grouped. U.S.S.G. § 3D1.2(b) (2002). Count One alleges attempted travel with intent to engage in criminal sexual activity with victims "Em Em" and "Janel." Count Two alleges use of facilities of interstate and foreign commerce to entice victim "Em Em" into sexual activity, and Count Three alleges enticement of victim "Janel." Thus, Counts One and Two share a common victim, and Counts One and Three share a different common victim.

Seljan's attempted travel to the Philippines (alleged in Count One) and the packages sent to the victims seeking to

---

[11]Sentencing Guidelines Manual section 3D1.4 accounts for multiple offenses at sentencing by imposing an offense level enhancement, the size of which depends on a weighted sum of grouped counts and individual counts. *See* U.S.S.G. § 3D1.4.

entice them into illicit sexual activity (alleged in Counts Two and Three) arguably involve the same composite harm to each minor victim and are connected by a common criminal objective or plan. *See* U.S.S.G. § 3D1.2 cmt. n.4. Thus, it may be appropriate to combine the three counts into two groups: one for the conduct against the victim common to Counts One and Two, and the other for conduct against the victim common to Counts One and Three.[12]

[11] Even if Seljan is correct, however, he is not entitled to relief. Assuming the first three counts should be consolidated into two groups for purposes of applying U.S.S.G. § 3D1.4, this is only a net reduction of one unit. With one unit for Counts Six and Seven (which were grouped below) and another for Count Four, the total units for purposes of applying section 3D1.4 is four. This would still result in a four-level increase in offense level, the same amount imposed by the district court. *See* § 3D1.4 (prescribing a four-level increase for three-and-a-half to five units). There was no error in calculating the Guidelines range since the result would have been the same either way.

### B.  Advanced Age

[12] Seljan argues that the district court did not adequately consider his advanced age. This argument is meritless. The district court acknowledged that Seljan's age and health reduced the likelihood of recidivism, and it addressed Seljan's concern that the 20-year sentence at age 87 was tantamount to life imprisonment. The district court even considered the sentence that a defendant without a prior conviction would receive. Indeed, the sentence imposed by the district court

---

[12]It does not matter that the government failed to separate the allegations in Count One, which names two victims, into two separate counts. *See United States v. Calozza*, 125 F.3d 687, 689-90 (9th Cir. 1997) (holding that the purpose of the grouping provisions is to prevent prosecutors from enhancing sentences by manipulating the counts charged).

was 22 months below the low end of the Guidelines range. Seljan argues only that the reduction should have been even greater. On this record, however, the district court's sentence was reasonable.

### C.   Effect of Seljan's Prior Conviction

**[13]** Finally, Seljan argues that the district court gave too much weight to the Guidelines by applying a criminal history category of V pursuant to Guidelines section 4B1.5(a)(2), which provides for sentencing of "[r]epeat and [d]angerous [s]ex [o]ffender[s] [a]gainst [m]inors."

No party seriously disputes that Seljan's 1977 Wisconsin conviction qualifies as a "sex offense conviction" under section 4B1.5. Rather, Seljan argues that because criminal history is primarily relevant as an indicator of future recidivism, the district court should have disregarded the elevated criminal history category in light of his age and low actual likelihood of recidivism. But the district court was not permitted to ignore the prior conviction. If it had simply disregarded the prescription of section 4B1.5, it would have violated the requirement that the district court properly calculate the Guidelines range before deciding whether such a sentence is reasonable. *See Carty*, 520 F.3d at 991. Moreover, the court did consider the impact of Seljan's age on his likelihood of recidivism after it calculated the Guidelines range and adjusted the sentence accordingly. Nothing in the record compels any further tinkering.

## IV.   Conclusion

**[14]** We hold that customs officials acting under authority of 31 U.S.C. § 5317(b) may, at the functional equivalent of the border, search a package or container being shipped via FedEx across the border, without a warrant. The inspection may include smaller envelopes or other wrapped or sealed objects contained within the package. The search does not

violate the Fourth Amendment simply because it may entail scanning of personal correspondence, or because the evidence of contraband or other criminal activity that is detected may not relate to the interdiction of undeclared currency. To unreasonably constrain customs inspectors from searching and seizing obviously incriminating materials would be imprudent and inconsistent with Fourth Amendment jurisprudence. We also hold that the sentence imposed on Seljan by the district court was procedurally correct and substantively reasonable.

**AFFIRMED**

CALLAHAN, Circuit Judge, concurring, joined by Judge BEA:

Border searches of persons or property entering or exiting the United States are *per se* reasonable under the Fourth Amendment. *See United States v. Flores-Montano*, 541 U.S. 149, 152-53 (2004). The search of Seljan's FedEx package was reasonable simply by virtue of the fact that it occurred at the border. Accordingly, the only question that remains is whether Seljan has shown that the search of his FedEx package was conducted in a "particularly offensive manner" or was so destructive as to require some level of suspicion. *Id.* at 154-56. Because the majority agrees that he has not, the Constitution does not demand we go any further. I write separately because the majority takes the unwarranted step of examining the reasonableness of the "scanning" methodology and whether precedents involving the plain view doctrine support such an analysis. This approach has no place in Fourth Amendment border search jurisprudence.

## I.

The border search exception to the Fourth Amendment has enjoyed an "impressive historical pedigree." *United States v.*

*Villamonte-Marquez*, 462 U.S. 579, 585 (1983) (discussing the lineage of 19 U.S.C. § 1581). Since the birth of our nation, Congress — acting pursuant to its constitutional authority under Article I, § 8, cl. 3 "[t]o regulate Commerce with foreign Nations" — has granted the Executive plenary authority to conduct routine searches at the border to protect our territorial integrity. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). The earliest customs statute enacted by the First Federal Congress — even before its proposal of the Fourth Amendment — granted officials the " 'full power and authority' to enter and search 'any ship or vessel, in which they shall have reason to suspect any goods, wares or merchandise subject to duty shall be concealed. . . .' " *United States v. Ramsey*, 431 U.S. 606, 616 (1977) (quoting Act of July 31, 1789, ch. 5, § 24, 1 Stat. 29). It is because this same Congress proposed for adoption the original amendments to the Constitution two months later, that the Supreme Court has stated "it is clear that the members of that body did not regard searches and seizures of this kind as 'unreasonable,' and they are not embraced within the prohibition of the amendment." *Boyd v. United States*, 116 U.S. 616, 623 (1886), *overruled on other grounds*, *Warden v. Hayden*, 387 U.S. 294 (1967). Most recently, the Supreme Court has explained that " 'searches made at the border . . . are reasonable simply by virtue of the fact that they occur at the border.' " *Flores-Montano*, 541 U.S. at 152-53 (quoting *Ramsey*, 431 U.S. at 616). The Court has "faithfully adhered" to this position that "border searches [are] not subject to the warrant provisions of the Fourth Amendment and [are] 'reasonable' within the meaning of that Amendment." *Ramsey*, 431 U.S. at 617 (citing *Carroll v. United States*, 267 U.S. 132, 153-54 (1925)). For this reason, the Court has stated that:

> Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant, and first-class mail may be opened without a warrant on less than probable cause. Automotive travelers may be

> stopped at fixed checkpoints near the border without individualized suspicion . . . , and boats on inland waters with ready access to the sea may be hailed and boarded with no suspicion whatever.

*Montoya de Hernandez*, 473 U.S. at 538 (internal citations omitted). Based on this authority, we have recognized that "there can be no constitutional violation for the border search of . . . international mail by a customs inspector." *United States v. Ani*, 138 F.3d 390, 392 (9th Cir. 1998).

The rationale behind the border search exception has its origins in national self-protection, and it is a necessary instrument to protect our sovereignty. "The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *Flores-Montano*, 541 U.S. at 152. Historically, such broad powers have been necessary to prevent the introduction of contraband into this country and to regulate the collection of duties. *See Montoya de Hernandez*, 473 U.S. at 539.[1] At perhaps no other time in our nation's history are border searches as vital to maintaining national security. Although our founders could not have anticipated the threats we face as a nation some two centuries later, they saw fit to provide border officers with unique tools, not seen with domestic applications, to protect our nation's territorial integrity.

While searches at the border are generally *per se* reasonable, the Supreme Court has left "open the question 'whether, and under what circumstances, a border search might be deemed "unreasonable" because of the particularly offensive

---

[1]The border search doctrine, however, "is not limited to cases where the searching officers have reason to suspect the entrant may be carrying foreign contraband." *United States v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006) (applying *Flores-Montano* to uphold the search of the defendant's laptop at the border while assuming, for the sake of argument, the defendant "ha[d] no opportunity to obtain foreign contraband").

manner in which it was carried out.' " *Flores-Montano*, 541 U.S. at 155 n.2 (quoting *Ramsey*, 431 U.S. at 618 n.13). Although the contours of what constitutes a search conducted in an "offensive manner" may not be well defined, Fourth Amendment considerations of the manner in which a search is conducted differ depending on whether the search is of a person or property.

When it comes to searches of persons, law enforcement may need some level of suspicion for a highly intrusive search (*i.e.*, strip, body cavity, involuntary x-ray searches). In *Montoya de Hernandez*, the Court held that reasonable suspicion was required to detain a traveler, who was suspected of smuggling contraband in her alimentary canal, in a manner "beyond the scope of a routine customs search and inspection." 473 U.S. at 541 (detention of suspected smuggler for almost sixteen hours before seeking a warrant). The Court expressly declined to decide "what level of suspicion, if any, is required for nonroutine border searches such as strip, body cavity, or involuntary x-ray searches." *Id.* at 541 n.4.

When it comes to searches of property, the Court has also left open the possibility that a border search conducted in a "particularly offensive manner" may violate the Fourth Amendment. *See Flores-Montano*, 541 U.S. at 155 n.2 (quoting *Ramsey*, 431 U.S. at 618 n.13). However, the Court in *Flores-Montano* noted that "the reasons that might support a requirement of some level of suspicion in the case of highly intrusive searches of the person — dignity and privacy interests of the person being searched — simply do not carry over to vehicles." *Id.* at 152. The Court did not foreclose the possibility that certain searches of property may be so destructive that they require some level of suspicion. *Id.* at 155-56 (holding that the removal, disassembly, and reassembly of a fuel tank did not require particularized suspicion). We have applied *Flores-Montano* to suspicionless border searches of vehicles and found that a search resulting in damage to the interior quarter panel of a vehicle, *see United States v. Cortez-*

*Rivera*, 454 F.3d 1038, 1042-43 (9th Cir. 2006), the slashing of a vehicle's spare tire to search for contraband, *see United States v. Cortez-Rocha*, 394 F.3d 1115, 1125 (9th Cir. 2005), the removal of the interior door panels of a vehicle, *see United States v. Hernandez*, 424 F.3d 1056, 1059-60 (9th Cir. 2005), and the exploratory drilling of a single 5/16-inch hole in the bed of a truck, *see United States v. Chaudhry*, 424 F.3d 1051, 1053-54 (9th Cir. 2005), do not violate the Fourth Amendment.

A defendant seeking suppression of evidence based on the highly destructive manner in which the search was conducted bears the burden of proving the extent of the damage and its effect on the safety and operability of a vehicle. *See Cortez-Rivera*, 454 F.3d at 1041-42. As we explained in *Cortez-Rivera*, while the government typically bears the burden of justifying a warrantless search, the fact that the search of a vehicle is conducted at the border *ipso facto* determines the reasonableness of the search as long as there is not excessive damage to the defendant's vehicle. *Id.* at 1041. The defendant is in the best position to know the extent of damage done to his own vehicle and must demonstrate the nature and extent of this damage by a preponderance of the evidence. *Id.* at 1042. I see no reason why this same burden should not be placed on Seljan to demonstrate that the search here damaged or destroyed his FedEx package. He does not assert, for example, that customs shredded any of his letters or destroyed any of his pornographic pictures. Like the majority, I conclude that Seljan is unable to satisfy the narrow exceptions to the border search doctrine.

Seljan instead contends that the search of his FedEx package was unreasonably intrusive in scope because customs inspectors read his personal correspondence contained in a letter-sized envelope within the package. As the majority points out, the Supreme Court in *Ramsey* held that for Fourth Amendment purposes, letters mailed internationally are treated the same as if carried by an entering traveler in his

luggage or on his person. Maj. Op. at 14804 (citing *Ramsey*, 431 U.S. at 620). It is the fact that the mailed envelope crosses the border that makes a search of that envelope reasonable under the Fourth Amendment. *See Ramsey*, 431 U.S. at 620. The Supreme Court and this circuit have upheld a variety of suspicionless searches of property at the border: the search of a laptop computer and other personal electronic storage devices including a hard drive and computer memory stick, *see United States v. Arnold*, 523 F.3d 941, 946 (9th Cir. 2008); a United Parcel Service package containing a sealed envelope with two social security cards, two permanent resident alien cards, handwritten notes, and an identification booklet written in Arabic, *see United States v. Abbouchi*, 502 F.3d 850, 855-56 (9th Cir. 2007); the contents of a traveler's briefcase and luggage, *see United States v. Tsai*, 282 F.3d 690, 696 (9th Cir. 2002); papers in a traveler's shirt pocket, *see United States v. Grayson*, 597 F.2d 1225, 1228-29 (9th Cir. 1979); a traveler's purse and wallet, *see Henderson v. United States*, 390 F.2d 805, 808 (9th Cir. 1967); and graphic photographs deemed to be obscene by customs agents, *see United States v. Thirty-Seven Photographs*, 402 U.S. 363, 376 (1971). I see no reason to treat the search of Seljan's international FedEx package any differently.

We have also foreclosed the argument that there is a First Amendment exception to the border search doctrine for expressive material. In *United States v. Arnold*, the defendant argued that a suspicionless border search of his laptop computer violated the Fourth Amendment because First Amendment principles require a higher level of suspicion when it comes to expressive material. 523 F.3d at 944. We found this unpersuasive and adopted the Fourth Circuit's position in *United States v. Ickes*, 393 F.3d 501 (4th Cir. 2005). *See Arnold*, 523 F.3d at 948 (stating that the court would "follow the reasoning of *Ickes*"). Rejecting the creation of a First Amendment exception to the border search doctrine, the Fourth Circuit in *Ickes* reasoned, "[p]articularly in today's world, national security interests may require uncovering ter-

rorist communications, which are inherently 'expressive.' Following [the defendant's] logic would create a sanctuary at the border for all expressive material — even for terrorist plans. This would undermine the compelling reasons that lie at the very heart of the border search doctrine." 393 F.3d at 506. The Fourth Circuit also noted the significant hardships that border inspectors would face if there was a First Amendment exception, which would require them to engage in the sort of decision-making process that the Supreme Court wished to avoid in sanctioning expansive border searches.[2] *Id.* (citing *Flores-Montano*, 541 U.S. at 152-54).

The customs officer's search of Seljan's FedEx package was reasonable under the Fourth Amendment simply because it occurred at the functional equivalent of the border. *See Flores-Montano*, 541 U.S. at 152-53; *Ramsey*, 431 U.S. at 616. Seljan has failed to demonstrate that the search of his FedEx package was conducted in a "particularly offensive manner" or was so destructive as to require some level of suspicion. The fact that Seljan's correspondence contained

---

[2]The Fourth Circuit also noted that even though the Supreme Court in *Ramsey* did not reach the question of whether the First Amendment exempts expressive material from border searches, subsequent authority suggests that it is unlikely. *Ickes*, 393 F.3d at 507. The court in *Ickes* noted that in *New York v. P.J. Video*, 475 U.S. 868 (1986), the Supreme Court refused to require a higher standard of probable cause for warrant applications when expressive material is involved than that used in other areas of Fourth Amendment law. *Id.* at 874. Our circuit has also recognized that the Supreme Court in *P.J. Video* rejected the proposition that a stricter probable cause standard should apply when First Amendment values are implicated. *United States v. Weber*, 923 F.2d 1338, 1342 n.6 (9th Cir. 1991). The Supreme Court in *P.J. Video* commented that "an application for a warrant authorizing the seizure of materials presumptively protected by the First Amendment should be evaluated under the same standard of probable cause used to review warrant applications generally." 475 U.S. *Id.* at 875. With this in mind, the Fourth Circuit commented that "[g]iven the Court's reluctance to create a First Amendment exception to the general principles governing warrant applications, we find it unlikely that it would favor a similar exception to the border search doctrine." *Ickes*, 393 F.3d at 507.

expressive material does not alter this analysis. Accordingly, I would find that this border search was *per se* reasonable under the Fourth Amendment.

## II.

I must part ways with the majority because the Fourth Amendment's border search exception does not require us to examine the reasonableness of the "scanning" methodology or whether precedents involving the plain view doctrine support this approach. *See* Maj. Op. at 14811-13. The search of Seljan's FedEx package was *per se* reasonable simply because it occurred at the functional equivalent of the border. The majority's approach endorses an *ad hoc* review of the reasonableness of the method of conducting a border search of property that has no place in Fourth Amendment jurisprudence. The fact that Seljan has not demonstrated that the search of his FedEx package was conducted in a "particularly offensive manner" or was so destructive as to require some level of suspicion — a conclusion with which the majority agrees — ends the Fourth Amendment inquiry.

Congress may place statutory restrictions on the manner in which law enforcement conducts border searches. *See, e.g.*, 19 U.S.C. § 1583 (placing restrictions on searches of international mail sent via the U.S. Postal Service). U.S. Customs and Border Protection may promulgate regulations setting forth procedures by which border searches are conducted. *See, e.g.*, 19 C.F.R. § 145.3(b)-(c) (prohibiting inspectors from opening or reading sealed international letter class mail without a valid search warrant or consent from the sender). The Constitution, however, does not require that we analyze the reasonableness of these methods or procedures unless they allow for particularly offensive or highly destructive border searches. *See Flores-Montano*, 541 U.S. at 154-56. Examining the border search methods used by Customs and Border Protection for reasonableness under the Fourth Amendment invites the application of complex balancing tests and *ad hoc*

reviews of search procedures that have no place under the Constitution. The Supreme Court has already warned us not to create complex balancing tests when it comes to searches of property, *see id.* at 152 (stating that "[c]omplex balancing tests to determine what is a 'routine' search of a vehicle . . . have no place in border searches of vehicles"),[3] and we should heed that warning by confining our analysis to whether the search was conducted in a "particularly offensive manner" or was excessively destructive.

I share the majority's sentiment that we must not "impose an unworkable and unreasonable constraint on the nation's customs officials[.]" Maj. Op. at 14812. Unfortunately, while recognizing the "disastrous consequences" that may result by placing "imprudent constraint[s]" on customs inspectors, *see id.* at n.8, the majority's opinion now requires our border patrol officers engage in the sort of decision-making process that the Supreme Court wished to avoid in sanctioning expansive border searches.[4]

---

[3]We have previously recognized the danger of creating new balancing tests when it comes to border searches of property. *See, e.g.*, *Arnold*, 523 F.3d at 946 (stating that "*Flores-Montano* rejected our prior approach of using an intrusiveness analysis to determine the reasonableness of property searches at the international border"); *Chaudhry*, 424 F.3d at 1054 (rejecting as a result of *Flores-Montano* a distinction between "routine" and "nonroutine" searches of property); *Cortez-Rocha*, 394 F.3d at 1122 (declining as a result of *Flores-Montano* to "formulate a new balancing test for determining when a border procedure is so destructive or so damaging as to invade the rights protected by the Fourth Amendment").

[4]Although evidence of pedophilia may have been obvious from a scan of Seljan's letter, those who protect our borders and are charged with preventing another 9/11 attack are faced with threats from individuals much more sophisticated than Seljan. It is unlikely that terrorists would be as bold as Seljan and "unabashedly announce[ ]" in the first paragraph of a letter to coconspirators: "The bomb we have prepared and placed at LAX will go off at 10:30 a.m. on Monday."

## III.

Although the majority relies on the customs inspector's statutory authority to conduct the currency interdiction operation under 31 U.S.C. § 5317(b), I share the district court's conclusion that the search of Seljan's FedEx package to an address abroad was also statutorily authorized under 19 U.S.C. § 1582. Section 1582 authorizes general border searches of packages at the border and is applicable to searches of international mail. *See United States v. Taghizadeh*, 41 F.3d 1263, 1265 (9th Cir. 1994) (en banc). On its face, section 1582 does not require any particularized suspicion to conduct border searches of international mail.[5] *See* 19 U.S.C. § 1582.

While the Constitution prescribes the floor below which protections may not fall, rather than a ceiling, Congress can provide greater statutory protection. Congress has done so in 19 U.S.C. § 1583 when it comes to international letter mail sent via the United States Postal Service. Under 19 U.S.C. § 1583(d), customs inspectors may not search international mail sent via the U.S. Postal Service weighing 16 ounces or less. Congress has made a deliberate choice to provide greater statutory protection for international correspondence sent via the U.S. Postal Service. If Seljan wished to maintain an

---

[5]In *United States v. Ani*, we examined the fact that Customs and Border Protection, acting pursuant to its authority to interpret section 1582, has promulgated regulations (19 C.F.R. § 145.3) that prohibit its inspectors from opening or reading sealed letter class mail without a valid search warrant or consent from the sender. 138 F.3d at 392. In *Ani* we stated that "there can be no constitutional violation for the border search of incoming international mail by a customs inspector[.]" 138 F.3d at 392. The court assumed, without deciding, that the customs inspector violated 19 C.F.R. § 145.3 and stated that "[a]bsent a constitutional violation or a congressionally created remedy, violation of an agency regulation does not require suppression of evidence." *Id.* (citations omitted). This regulation that customs has chosen to enact reflects nothing more than the agency's voluntary decision to police itself above and beyond anything that the Constitution or Congress requires.

expectation of privacy in the contents of his correspondence, he could have availed himself of the statutory protections contained in 19 U.S.C. § 1583 and mailed his correspondence through the U.S. Postal Service.

## IV.

I write separately because the majority fails to appreciate that the Executive Branch has been given plenary authority to conduct border searches to protect our territorial integrity. The Supreme Court recognizes that these searches are *per se* reasonable. Absent a border search being conducted in a "particularly offensive manner" or in such a manner as to be so destructive as to require some level of suspicion — which the majority agrees this search was not — there is no place for assessing whether the scanning of correspondence was reasonable under the Fourth Amendment when it comes to border searches. The search of Seljan's FedEx package was reasonable "simply by virtue of the fact that [it] occur[red] at the border." *Flores-Montano*, 541 U.S. at 152-53 (quoting *Ramsey*, 431 U.S. at 616). The Constitution does not require more. Finally, I note that in the absence of any constitutional prohibition, Congress has made the deliberate choice to provide greater statutory protection for international mail sent via the U.S. Postal Service. If Congress wants to increase the protection for correspondence sent via couriers other than the U.S. Postal Service, that is a decision that should be made by Congress, not the courts.

---

KOZINSKI, Chief Judge, dissenting:

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, *papers*, and effects . . . ." The reference to papers is not an accident; it's not a scrivener's error. It reflects the Founders' deep concern with safeguarding the privacy of thoughts and ideas—what we

might call freedom of conscience—from invasion by the government. Because my colleagues in the majority don't see this right as very important, they authorize the government to read every scrap of paper that crosses our borders, whether in a pocket or purse, a package, suitcase or envelope. My concurring colleagues don't recognize this right at all, and thus give customs agents free rein to conduct whatever search they please, for whatever reasons they choose, unless they destroy property or invade the body.

But the Founders were as concerned with invasions of the mind as with those of the body, the home or personal property —which is why they gave papers equal rank in the Fourth Amendment litany. The sum and substance of today's opinion is that we remove papers as an independent sphere of constitutional protection, treating them simply as a species of effects. Because our commission as federal judges does not authorize us to blue-pencil words written by the Founding Fathers, I respectfully dissent.

My colleagues cite various cases that ostensibly help them, but none are on point. *United States* v. *Ramsey*, on which both the majority and concurrence rely, does not go nearly as far as my colleagues would have it. What the Supreme Court held there is that envelopes are no more immune from border searches than any other package; containers of any size and kind can be opened at the border and inspected for contraband that might be concealed inside. 431 U.S. 606 (1977). The case involved a search of envelopes whose shape and bulk suggested contraband, not correspondence. *Id.* at 609. The case did not involve *reading* anything within the envelopes, nor did it involve an effort to obtain evidence of criminal activity unconnected to the customs laws. *Ramsey* treated mailed envelopes as effects because they were simply containers being searched for smuggled items. The Court therefore expressly declined to say anything about the government's authority to read private papers. *Id.* at 623-24.

Nor is *United States* v. *Flores-Montano* of any great help. 541 U.S. 149 (2004). The Court reiterated the general rule of *Ramsey* that any container crossing the border—there, a vehicle's gas tank—can be searched for contraband without suspicion, noting possible exceptions for unduly intrusive searches that affect the "dignity and privacy interests of the person being searched," *id.* at 152, as well as searches that are unduly destructive of property, *id.* at 155-56. It's far from clear that this list of exceptions is exhaustive—it certainly doesn't purport to be—but even if it were, I should think that having perfect strangers rummage through one's diary, personal correspondence, medical prescriptions or other private writings would seriously harm one's "dignity and privacy interests."

The cases dealing with suspicionless border searches are all about intercepting contraband that is being carried across the border right there and then; essentially, they are all container cases. To be sure, the containers sometimes take an unusual form—a gas tank, a spare tire, a pocket or briefcase, even a body cavity. *See, e.g.*, *Flores-Montano*, 541 U.S. 149; *United States* v. *Cortez-Rocha*, 394 F.3d 1115 (9th Cir. 2005); *United States* v. *Duncan*, 693 F.2d 971 (9th Cir. 1982); *United States* v. *Montoya de Hernandez*, 473 U.S. 531, 541 (1985). But the purpose of all these searches is the interdiction of prohibited or dutiable items concealed within the package that is crossing the border. Using border searches for a purpose unrelated to border control—such as general crime prevention—raises a wholly different issue.

Imagine that the federal government decided to read every letter, every e-mail, every diary, every document that crosses our borders, in order to increase the overall level of law enforcement by investigating crimes mentioned or documented in these writings. This would not be an effort to secure our borders—in fact, it would have nothing at all to do with the borders, except that the evidence would be collected there. This kind of operation raises very different Fourth

Amendment concerns than those the Supreme Court dealt with in *Ramsey*, *Flores-Montano* or any of the other cases my colleagues cite. It's the very maneuver we condemned almost twenty years ago in *United States* v. *$124,570 U.S. Currency*: using a search justified for one purpose (such as airline security or protection of the borders) to achieve a totally unrelated objective (general law enforcement). 873 F.2d 1240 (9th Cir. 1989). Ten years later, in *United States* v. *Bulacan*, we reiterated that "courts must take care to ensure that [a suspicionless contraband] search is not subverted into a general search for evidence of crime," emphasizing the "vast potential for abuse" and intrusion "into the privacy of ordinary citizens." 156 F.3d 963, 967 (9th Cir. 1998). Today, these admonitions are forgotten.

There can be no doubt that the officers here saw their mission as far more than intercepting contraband: They viewed themselves as law enforcement officers in the full sense of the term, and their mission as detecting evidence of *all* criminal activity. Tom LeBlanc, a supervisory customs inspector, filed a declaration explaining the inspectors' modus operandi:

> The usual protocol is for Customs inspectors to open and inspect for evidence of a violation of law (such as failing to declare certain amounts of monies), or for articles that are prohibited from export (such as weapons of mass destruction, illegal narcotics, etc). In inspecting the packages, Customs inspectors adopt a two-tier approach. First, they scan, not read, any documents. If something during their scan gives them reasonable suspicion to suspect a violation of law, the inspectors give a closer inspection to the contents of the package. If the package does not appear to violate the law or create any type of reasonable suspicion, the contents of the package are re-packaged and the package is then returned to the sorting process for loading onto the appropriate international airplane.

Inspector LeBlanc makes it clear that failure to declare currency is only an example of a "violation of law" for which the inspectors are on the lookout. He then speaks generally of deriving reasonable suspicion of a "violation of law" from scanning the text of any documents in the packages. Inspector Oliva, who searched Seljan's first package, was even more explicit: "We are looking for anything that's related to contraband being shipped out of the country *or anything that's contrary to law*."

The way the customs inspectors dealt with Seljan's package further proves that the search was designed to sweep far beyond intercepting contraband currency or preventing the exportation of WMDs. Even if one can buy into the fatuous notion that Inspector Oliva believed that Seljan's letter, headed by a Calvin and Hobbes cartoon, was actually a disguised bearer bond or the blueprint for a dirty bomb, the inspector's initial scan revealed nothing at all to support any such a suspicion. Rather, what raised the inspector's hackles was the inference that the writer of the letter may have been engaged in criminal activity unrelated to the customs laws. Even his thorough read didn't reveal enough to establish probable cause or make an arrest; there was just enough to open up a file on the writer and start an investigation of a crime that had nothing to do with customs control. A similar file and investigation could be opened up on any one of us, if words we put in a personal letter or e-mail raise the suspicions of some faceless apparatchik.

The government makes much of the fact that the customs agents use a two-step procedure—first scanning the documents, then reading them—and my colleagues in the majority take comfort in this. (My colleagues in the concurrence see it as a needless delay, as they are satisfied to have government agents read every scrap of paper and every electronic document that crosses our borders.) But the two-step procedure should give us no comfort at all: How else would the agents decide which documents to read? There are too few agents

and too little time for them to read every word. The sensible thing to do is to scan each document and see if something suspicious pops out; if it does, they go back and read the whole thing. The two-step procedure is not, as they say in computer parlance, a bug—it's a feature: It enables experienced law enforcement agents to read the maximum number of documents likely to yield evidence of crime. The procedure certainly doesn't keep them from reading whatever they want to read, and our approval of it is a green light for customs agents to go on fishing expeditions through all private papers and electronic documents that are sent or carried across our national borders.

Which brings us back to the Fourth Amendment's explicit reference to papers as an object of solicitude. Had the Founders meant to treat documents like other kinds of property, they would have had no reason to refer specifically to papers. Papers are personal property and thus would have been covered by the Fourth Amendment's reference to effects. What makes papers special—and the reason they are listed alongside houses, persons and effects—is the ideas they embody, ideas that can only be seized by reading the words on the page.

The constitutional text reflects the Founding generation's fear and suspicion of government agents seizing and reading private papers, sentiments stirred up by the Wilkes affair of the 1760s. Eric Schnapper, *Unreasonable Searches and Seizures of Papers*, 71 Va. L. Rev. 869, 884-89 (1985); *see also* Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 561-67 (1999). Trying to develop a seditious libel case against opposition leader John Wilkes and his supporters, the British government seized papers from the homes of the suspects on a general warrant. Davies, 98 Mich. L. Rev. at 562. Wilkes and others sued, and a series of British cases held the searches and seizures illegal under English common law. Schnapper, 71 Va. L. Rev. at 876, 912-13.

As the Wilkes affair unfolded in England, the colonists followed it with fervent interest: Colonial newspapers in the 1760s and 1770s were filled with accounts of the Wilkes trials; towns and children were named after Wilkes; "Wilkes and Liberty" became a patriot slogan. *Id.* at 876 & n.38; Pauline Maier, *John Wilkes and American Disillusionment with Britain*, 20 Wm. & Mary Q. 373, 375 (1963). The colonists hailed the cases condemning the searches as a major vindication of their personal liberties. Schnapper, 71 Va. L. Rev. at 876 n.38; Davies, 98 Mich. L. Rev. at 564-65 & n.22.

The most famous case, *Entick* v. *Carrington*, rejected the government's claim of unrestrained power to search personal papers as "exorbitant," stressing the owner's strong privacy interest: "Papers are the owner's . . . dearest property; and are so far from enduring a seizure, that they will hardly bear an inspection." 19 Howell's State Trials 1029, 95 Eng. Rep. 807 (1765). Because of *Entick*'s influence on the Founding generation, the Supreme Court has long used it as a guide in interpreting the Fourth Amendment. As the Court explained in *Boyd* v. *United States*, "every American statesman, during our revolutionary and formative period as a nation, was undoubtedly familiar with this monument of English freedom, and considered it as the true and ultimate expression of constitutional law . . . sufficiently explanatory of what was meant by unreasonable searches and seizures." 116 U.S. 616, 626-27 (1885); *see also Brower* v. *County of Inyo*, 489 U.S. 593, 596 (1989).

*Entick* and the other Wilkes cases reflect a very different attitude towards the privacy of thoughts and ideas than that of my colleagues here, who dismiss the reading of personal correspondence as "nothing like an intrusive body search," maj. op. at 14814. The prevailing party in *Entick* and the most prominent commentators on the Wilkes affair considered the search of private papers every bit as intrusive as a body search. The plaintiff in *Entick* described the search as "worse than the Spanish inquisition," and compared reading a man's

private correspondence to "racking his body to come at his secret thoughts." 19 Howell's State Trials 1029, 95 Eng. Rep. 807. The most prominent political pamphlet on the Wilkes affair, widely read in both England and the colonies, described these searches in similar terms:

> Every body has some private papers, that he would not on any account have revealed. A lawyer hath frequently the papers and securities of his clients; a merchant or agent, of his correspondents. What then, can be more excruciating torture, than to have [government agents] . . . amuse themselves with the perusal of all private letters, memorandums, secrets and intrigues . . . . [W]ould any gentleman in this kingdom rest one minute at ease in his bed, if he thought, that . . . every secret of his family [was] made subject to the inspection of a whole Secretary of State's Office?

Father of Candor, *A Letter Concerning Libels, Warrants, the Seizure of Papers, and Sureties for the Peace or Behaviour; with a View to some late Proceedings and the Defence of Them by the Majority* 54-55 (5th ed. London 1765).

Another prominent political pamphlet agreed that the searches violated fundamental rights, stressing the privacy interest in papers. Papers contain people's most personal information, the writer explained, "sealed up in silence, not to be broke, but with their own heart-strings," so that "some men would rather die" than submit to having their papers searched. *A Letter to the Right Honourable the Earls of Egremont and Halifax, His Majesty's Principal Secretaries of State, on the Seizure of Papers* 8-9 (London 1763). Has our regard for privacy deteriorated so precipitously since the time of the Founders?

The Founding generation recognized that the seizure of private papers also undermines freedom of speech. The author of

the *Letter to Egremont and Halifax* feared that the searches would mean "an end of confidence amongst mankind. A severe restraint is laid upon friendship and correspondence, and even upon the freedom of thought." *Id.* at 25. Father of Candor expressed the same concerns. As long as such searches were allowed, he lamented, Englishmen "must enjoy our correspondencies, friendships, papers and studies . . . at the will and pleasure of . . . inferior agents!" Father of Candor, *supra*, at 59. Story later described, in similar terms, the chill on speech that would result from failing to protect personal correspondence. It would, he explained, "compel every one in self-defence to write even to his dearest friends with the cold and formal severity with which he would write to his wariest opponents or his most implacable enemies." Joseph Story, *Commentaries on Equity Jurisprudence* 251 (Boston, Little, Brown and Co., 13th ed. 1886).

The Supreme Court recognized in *Ramsey* that allowing customs agents to read personal correspondence in border searches would raise a serious First Amendment issue. The Court did not reach the question only because the applicable "postal regulations flatly prohibit[ed], under all circumstances, the reading of correspondence absent a search warrant." 431 U.S. at 623-24. The majority, in a footnote, declines to "consider any potential violation of the First Amendment." Maj. op. at 14809 n.8. But *Ramsey* suggests that these "First Amendment considerations" are highly relevant in a case like ours, where customs agents read personal letters without a warrant or even reasonable suspicion. 431 U.S. at 623-24.

The Founding generation also saw the seizure of private papers as undermining the right against self-incrimination. Father of Candor complained that seizing a man's papers to build a criminal case against him "would be making a man give evidence against and accuse himself, with a vengeance." Father of Candor, *supra*, at 56. The author of the *Letter to Egremont and Halifax* agreed that the searches were function-

ally the same as compelled self-incrimination: It could not be that "though a man's tongue is not permitted to bear testimony against him, his thoughts are to rise in judgment, and to be produced as witnesses to prove the charge." *A Letter to Egremont and Halifax*, *supra*, at 20. The Supreme Court has recognized these concerns, condemning suspicionless searches and compelled production of private papers as unduly intrusive. *United States* v. *Doe*, 465 U.S. 605 (1984) (government cannot compel production of self-incriminating documents); *Go-Bart Importing Co.* v. *United States*, 282 U.S. 344 (1931) (government cannot conduct a general exploratory search of papers in the hope that evidence of a crime may be found). To my colleagues, they count for nothing.

\* \* \*

The majority's reluctance to step between Mr. Seljan and his well-merited punishment is understandable. Seljan's long career of "sexually educating" children is heinous; it's difficult to regret that he will spend the rest of his life in prison. But this result comes at a high price: allowing serious invasions into the privacy of millions of Americans, innocent as well as guilty. The previously "narrow" border search exception, *United States* v. *Sutter*, 340 F.3d 1022 (9th Cir. 2003), is now a gaping hole. Every envelope containing birthday cards or trade secrets, every e-mail, every diary, every laptop that crosses the border can be opened and its contents read by government agents, without a warrant or even founded suspicion. Worse yet, by treating these seizures as a trivial annoyance rather than a major intrusion into our freedom of thought, my colleagues open the door for police across the United States to read whatever private papers fall into their hands. This is the power the English government claimed in the Wilkes affair; the power that so outraged the colonists; the power the Fourth Amendment was built to shield us against. We sell this birthright very cheaply today.